RECEIVED

AUG 1 9 2014

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br>**NOAH RUDOLPH**<br>10018 Wards Grove Circle<br>Burke, VA 22015 | )<br>)<br>)<br>) |

**FILED UNDER SEAL**

| | |
|---|---|
| **ANDREA FORD**<br>6 rue Mesnil<br>75116 Paris<br>France | )<br>)<br>)<br>)<br>) |
| **LAWRENCE COSGRIFF**<br>6808 Old Stone Fence Rd.<br>Fairfax Station, VA 22039 | )<br>)<br>)<br>) |

Civil Action 1:10-01109 (RBW)

Plaintiffs,

v.

| | |
|---|---|
| **INCHCAPE SHIPPING SERVICES**<br>**HOLDINGS LIMITED,**<br>Units 5-8 Lakeside Business Village<br>Fleming Rd., Chafford-Hundred<br>Essex, RM166EW United Kingdom | )<br>)<br>)<br>)<br>) |

**JURY TRIAL**
**DEMANDED**

**INCHCAPE SHIPPING SERVICES**
**GROUP HOLDINGS LIMITED,**
Units 6-7 Lakeside Business Village
Fleming Rd., Chafford-Hundred
Essex, United Kingdom RM16 6YA

**ISS MARINE SERVICES, INC.,**
DBA Inchcape Shipping Services, Inc.
11 N. Water Street
Mobile, AL 36602

**INCHCAPE SHIPPING SERVICES S.A.**
Ricardo J. Alfaro Avenue
City Center Building, 3rd Floor
PO Box 0823-05456
Panama City, REPUBLIC OF PANAMA

**INCHCAPE SHIPPING SERVICES,**
**MILME SERVICIOS**

**MARITIMOS S.A., DBA**        )
**INCHCAPE SHIPPING SERVICES**    )
Av Saenz Pena 177, 7th floor       )
Callao, Lima, Peru         )
               )
**INCHCAPE SHIPPING SERVICES**    )
**DUBAI LLC**           )
Office Court Building        )
Oud Metha Rd.         )
P.O. Box 33166         )
Dubai, United Arab Emirates      )
               )
    Defendants.       )
_____)

## FIRST AMENDED COMPLAINT
### (False Claims Act, 31 U.S.C. §§ 3729 *et seq.*)

### INTRODUCTION

Defendant Inchcape Shipping Services Holdings Limited, a marine services provider headquartered in the United Kingdom, and its subsidiaries (collectively "ISS"), provide support and logistic services known as "husbanding services" to ships, including U.S. Navy, Coast Guard, Military Sealift Command and other U.S. ships ("U.S. Government-owned ships"), making port calls in U.S. and foreign ports.  This complaint alleges that ISS has defrauded the United States and violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, by overbilling the U.S. Navy and falsifying invoices for husbanding services provided to U.S. Government-owned ships in ports throughout the world, including in Southwest Asia, North, Central, and South America, and Africa. Plaintiffs Noah Rudolph, Andrea Ford and Larry Cosgriff ("Plaintiffs" or "Relators") learned of ISS' fraudulent billing practices while working in ISS' Government Services Division, headquartered in the United States. After failing to convince ISS to cease its unlawful billing practices and refund the overpayments improperly obtained from the Navy,

2

Plaintiffs reported ISS' fraud to federal Government officials.  Plaintiffs, by the undersigned counsel, bring this *qui tam* lawsuit on behalf of and in the name of the United States and themselves, and allege:

## JURISDICTION AND VENUE

1.      Counts I-VI of this First Amended Complaint ("Complaint") are civil actions by Plaintiffs acting on behalf of and in the name of the United States, against Defendants, under the federal False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

2.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because Defendants regularly transact business in this judicial district, regularly enter into contracts with U.S. Government entities headquartered in this judicial district, and have committed acts proscribed by 31 U.S.C. § 3729 in this judicial district.

3.      Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants regularly transact business in this judicial district, regularly enter into contracts with U.S. Government entities headquartered in this judicial district, and have committed acts proscribed by 31 U.S.C. § 3729 in this judicial district.

4.      None of the allegations set forth herein was based upon a public disclosure of allegations or transactions, as those terms are used in 31 U.S.C. § 3730(e)(4).

5.       To the extent any allegation set forth in the Complaint may have been based upon any public disclosures, Plaintiffs are permitted to proceed with this lawsuit because each of the Plaintiffs is an "original source" as that term has been defined in 31 U.S.C. § 3730(e)(4). Plaintiffs have direct and independent knowledge of the information on which the allegations in the Complaint are based and voluntarily provided the information to the Government prior to the

filing of the Complaint and prior to any public disclosures of the allegations or transactions set forth herein.

## PARTIES

6.      Plaintiff Noah Rudolph is a resident of Virginia. He served as an officer in the United States Marine Corps and a Special Agent in the Washington Field Office of the Federal Bureau of Investigations, focusing on international terrorism. Prior to joining ISS, Mr. Rudolph spent several years as a consultant to the United States on counter-terrorism, maritime supply-chain security, and federal emergency response matters. Mr. Rudolph was hired by Defendant ISS Marine Services, Inc. in October 2008 as the Chief Operating Officer for ISS' Government Services Division. Mr. Rudolph resigned from ISS on July 13, 2009.

7.      Plaintiff Andrea Ford resides in France and is a permanent resident of the United Kingdom. Before joining ISS, Ms. Ford spent five years as an Operations Representative for the U.S. Government. Ms. Ford was hired by Defendant ISS Marine Services, Inc. in August 2007. She became Assistant Manager of Government Services in North and Central America on December 1, 2007 and was promoted to Government Services Manager of North & Central America on March 1, 2008. Ms. Ford resigned from ISS on September 17, 2010.

8.      Plaintiff Lawrence ("Larry") Cosgriff is a resident of Virginia. Mr. Cosgriff is a retired Naval Reserve Intelligence Officer with over 30 years of experience in the maritime industry. Mr. Cosgriff was hired by Defendant ISS Marine Services, Inc. as the Senior Vice-President of ISS Government Services in April 2007. In September 2007, Mr. Cosgriff was made the *de facto* head of ISS Government Services for the Western Hemisphere. In March 2008, Mr. Cosgriff became head of ISS Government Services world-wide. Mr. Cosgriff was subsequently promoted to Executive Vice- President of ISS Government Services in February 2009. On

December 31, 2009, Mr. Cosgriff resigned from ISS Marine Services, Inc., with an official termination date of June 30, 2010.

9.      Plaintiffs Rudolph and Ford bring the claims asserted in Counts I-VI of the Complaint against all named Defendants for violations occurring from July 1, 2002 to the present. Plaintiff Cosgriff brings the claims asserted in Counts I-VI of the Complaint against Defendants Inchcape Shipping Services Holdings Limited, Inchcape Shipping Services Group Holdings Limited, Inchcape Shipping Services S.A., Inchcape Shipping Services, Milme Servicios Maritimos S.A., and Inchcape Shipping Services, Dubai LLC for violations occurring from July 1, 2002 to the present. Plaintiff Cosgriff brings the claims asserted in Counts I-VI of the Complaint against Defendant ISS Marine Services, Inc. for violations occurring from July 1, 2010 to the present.

10.      Defendant Inchcape Shipping Services Holdings Limited ("ISSHL"), a United Kingdom corporation, manages the activities of ISSHL's group of companies, including all other Defendants named in the Complaint, and acts as a holding company. Defendant Inchcape Shipping Services Holdings Limited enters into contracts with the U.S. Navy, and oversees contracts entered into by its subsidiaries with U.S. Navy, to provide goods and services to U.S. Government-owned ships.

11.      Defendant Inchcape Shipping Services Group Holdings Limited ("ISS Group"), a United Kingdom corporation, is the wholly-owned subsidiary of ISSHL through which ISSHL owns the other Defendants. Defendant Inchcape Shipping Services Group Holdings Limited, under the direction and control of ISSHL, oversees contracts entered into by its subsidiaries with the U.S. Navy to provide goods and services to U.S. Government-owned ships.

12.     Defendant ISS Marine Services, Inc. is a subsidiary of ISSHL. It is a husbanding services agency that is a citizen of Alabama, and oversees ISS' business in much of North and Central America. Under the direction and control of ISSHL, Defendant ISS Marine Services, Inc. contracts with the U.S. Navy and provides goods and services to U.S. Government-owned ships.

13.     Defendant Inchcape Shipping Services S.A. is a subsidiary of ISSHL. It is a husbanding services agency incorporated in the Republic of Panama, and oversees ISS' business in much of Central and South America. Under the direction and control of ISSHL, Defendant Inchcape Shipping Services S.A. contracts with the U.S. Navy and provides goods and services to U.S. Government-owned ships.

14.     Defendant Inchcape Shipping Services, Milme Servicios Maritimos S.A. is a subsidiary of ISSHL. It is a husbanding services agency incorporated in Peru, and oversees much of ISS' business in Peru. Under the direction and control of ISSHL, Defendant Inchcape Shipping Services, Milme Servicios Maritimos S.A. provides goods and services to U.S. Government-owned ships.

15.     Defendant Inchcape Shipping Services, Dubai LLC is a subsidiary of ISSHL. It is a husbanding services agency incorporated in Dubai, United Arab Emirates, and oversees much of ISS' business in Southwest Asia (including the United Arab Emirates, the Kingdom of Bahrain, Kuwait, Qatar, the Kingdom of Saudi Arabia, Jordan, Egypt, Djibouti, Kenya, the Seychelles, the Sultanate of Oman, South Africa, and other locations in southwest Asia and Africa). Under the direction and control of ISSHL, Defendant Inchcape Shipping Services, Dubai LLC contracts with the U.S. Navy and provides goods and services to U.S. Government-owned ships.

## THE FRAUDULENT CONDUCT

A.     U.S. Navy Husbanding Contracts and Related Laws and Regulations

16.     ISS describes itself as the world's leading marine services provider. ISS' primary line of marine business is the provision of support and logistic services known as "husbanding services" to ships, including U.S. Navy, Coast Guard, Military Sealift Command and other Government-owned ships ("U.S. ships"), making port calls throughout the world. As a husbanding service provider for U.S. ships engaged in military, humanitarian and/or rescue operations, ISS provides and arranges for the provision of supplies and services required by these ships in foreign and U.S. ports. These services and supplies typically include: i) arranging for services administered and controlled by host nation port authorities, parastatals and concessionaires —known as Port Tariff ("PT") items – such as pilots, pilot boats and tugs to help bring the ship into harbor; ii) collecting, removing and disposing of sewage (generally referred to by the acronym "CHT") and other waste products; iii) arranging with local vendors for the provision of fresh fruits and vegetables ("FFV") and other food and subsistence items; iv) arranging for the provision of bus, vehicle, water taxi and telephone services; and v) where required, arranging for force protection services and equipment.

17.     The U.S. Navy Supply Systems Command (NAVSUP) (hereinafter referred to as "the Navy"), through Fleet Industrial Supply Centers (FISC), contracts with various husbanding service companies, including ISS, to provide husbanding services for U.S. ships in ports throughout the world. NAVSUP husbanding service contracts (HSCs) typically are competitively awarded, requirements contracts for commercial items. HSCs include a daily flat-rate husbanding fee; fixed-price contract line items (CLIN services) (*e.g.*, agreed-upon unit prices for the removal of sewage); and Port Tariff (PT) items that are controlled by local port authorities,

charged to the Navy, and reimbursed to the contractor at cost. Services not specifically priced in the contract (non-CLIN items), such as arranging for the provision of food and other items by third-party local vendors, are also charged to the Navy and reimbursed to the contractor at cost. HSCs specify that the daily husbanding fees agreed to in the contract constitute the only compensation that the husbanding contractor may receive for arranging for the provision of non-CLIN and PT items and services.

18.     After providing husbanding services for a U.S. ship, HSC providers are contractually required to present invoices to the appropriate ship officer prior to the ship's departure. The invoices must itemize the services and goods provided, identifying specific CLIN items, PT items, and non-CLIN items procured from third-party vendors. Under many HSCs, contractors also are required to submit an electronic Final Cost Report, with cost and billing information on all goods and services provided. Where an invoice is based in part on an estimate, such as an estimate of the cubic meters of CHT (sewage) removal performed, HSC providers are contractually required to prepare revised invoices based on actual data once it becomes available, and to submit the new invoices, along with any credit due to the Navy, within the time frame specified in the contract.

19.     In performing husbanding services for the Navy, HSC providers are contractually required to "bring the highest level of commitment" to obtaining goods and services for U.S. ships from third-party vendors at fair and reasonable prices, and to "exploit opportunities for cost savings" (*see*, *e.g.*, Contract N4900-05-D-A008).

20.     In arranging to procure goods and services from third-party vendors, HSC providers must comply with the provisions of the Anti-Kickback Act of 1986, 41 U.S.C. §51, which prohibits government contractors from soliciting or accepting kickbacks, and from

including kickbacks in the contract price charged by a subcontractor to a prime contractor or by the prime contractor to the United States. The Act also requires any contractor who has reasonable grounds to believe that a violation of the Act may have occurred to report the possible violation to the Government.

21.     Under the Mandatory Disclosure Rules of the Federal Acquisition Regulations ("FAR"), when a Government contractor learns that there is credible evidence that the contractor (a) has violated a federal criminal law involving fraud, conflict of interest, or bribery, or (b) has violated the civil False Claims Act, or (c) has received a significant overpayment of Government funds, the contractor must make a timely disclosure of the potential violation(s) and remit all overpayments to appropriate officials in the Government agency with an interest in the matter, under penalty of suspension or debarment from further Government contract work. 48 C.F.R. §§ 3.1003(a)(2), (a)(3); *see also* 48 C.F.R. §§ 9.407-2(a)(8), 9.406-2(b)(1)(vi).

B.     ISS' Scheme to Overcharge the Navy for Husbanding Services Performed in Ports Throughout the World.

22.     In billing the Navy for husbanding services provided in ports throughout the world, including in Southwest Asia, North, Central, and South America, and Africa, ISS has engaged and continues to engage in a scheme to overcharge the United States by submitting false and inflated claims for payment, and by failing to refund identified, significant overpayments. As discussed more fully in paragraphs 23 through 146 below, ISS has employed a variety of methods to cheat the United States in billing for husbanding services, including:

a.   Soliciting and accepting kickbacks, in the form of discounts, rebates and commissions, from vendors selected by ISS to supply non-CLIN goods and services to U.S. ships;

b.  Failing to pass on to the Government discounts, rebates and other credits received from vendors and other providers on non-CLIN and Port Tariff items, notwithstanding the contractual requirements to do so;

c.  Concealing these discounts, rebates and other credits from the Government by presenting and causing to be presented false and fraudulent invoices to the Navy that failed to disclose the credits;

d.  Failing to report to the Government ISS' financial interest in vendors selected by ISS to provide goods and services to U.S. ships;

e.  Marking up invoices presented to the Navy for non-CLIN and Port Tariff items and services;

f.  Overstating in invoices presented to the Government the quantity of units of services performed;

g.  Charging the Government prices for fixed priced items that exceeded the agreed-upon contract price;

h.  Double-billing the Government by billing for fixed-price items and billing separately for  goods and services that were required to be included in the fixed-price charges;

i.  Billing the Government for bank and related financial fees in excess of the actual fees charged to and paid by Defendants;

j.  Failing to reconcile estimated bills with actual data, and to refund known overpayments to the Government;

k.  Maintaining a double set of invoices in its files to conceal its overbillings from Government auditors;

l.  Providing gifts to Government personnel in the form of dinners, lunches, cameras, cellular phones and other items;

m.  Failing to timely disclose to appropriate Government officials credible evidence that ISS violated the False Claims Act.

C.  The Southwest Asia Contract

23.  In 2005, Defendant Inchcape Shipping Services Holdings Limited entered into Contract N4900-05-D-A008 ("SWA contract") with the U.S. Navy to provide husbanding services for U.S. ships in ports in the United Arab Emirates, the Kingdom of Bahrain, Kuwait, Qatar, the Kingdom of Saudi Arabia, Jordan, Egypt, Djibouti, Kenya, the Seychelles, the Sultanate of Oman, and various locations in southwest Asia, for the period August 1, 2005 through July 31, 2010. The SWA Contract was subsequently extended through at least May 2014. The Navy has paid ISS over $280,000,000 under the SWA contract.

24.  Under the SWA contract, ISS is required to provide CLIN services at the fixed prices set forth in the contract. One of the most important and costly CLIN services that ISS provides is CHT (sewage) removal. CHT removal is to be billed, per the contract, at a fixed rate for the "actual cubic meters of CHT removed." ISS is also required to secure Port Tariff (PT) services from local port authorities. Under the terms of the contract, these PT services must be billed at the tariff rates in effect.

25.  When procuring services and supplies not priced in the SWA contract (non-CLIN items) from third-party vendors, ISS is required to employ a variety of measures to ensure that the Navy is charged a fair price. For example, whenever feasible, ISS is required to perform market surveys and develop price information from three sources. When procuring Fresh Fruits and Vegetables (FFV) and other food and subsistence items, ISS must provide the ship's

Ordering Officer with vendor invoices showing the quantities furnished and unit price in U.S. dollars and local currency. ISS is required to "bring the highest level of commitment" to ensure that prices charged by vendors are reasonable and that vendor costs are controlled.

26.     Under the SWA contract, ISS is required to present all available invoices for payment to the ship's Ordering Officer one day prior to the ship's departure. When a bill is based on estimates – e.g., an estimate of the number of cubic meters of CHT disposal – ISS is also obligated to submit an adjusted bill based on actual data, and to return any overpayments, within 30 days.

27.     The SWA contract provides that the daily husbanding fees agreed upon in the contract "**represent total compensation for the Contractor except for supplies and services with fixed prices.  Any other compensation in the form of rebates, discounts, etc., shall be credited to the U.S. Navy.**"

28.     As part of its proposal to win the SWA contract, ISS submitted a document entitled "RFP No. N49400-04-R-A005 Technical Approach." In the Executive Summary of the document, in a section entitled "Cost Savings," ISS stated that the "U.S. Navy will benefit from the buying power Inchcape can leverage from its extensive commercial customer base, and shared vendor base with the other Coalition Navies we represent." In a subsequent section entitled "Value for Money," ISS represented that it is "committed to providing a consistently high quality of service at fair and realistic rates. We will continue to seek ways of saving and avoiding costs, and improving the business process to the U.S. Navy's benefit." Regarding payment and reconciliation, ISS represented that "[w]hen an estimated bill is provided to the vessel, we always reconcile the estimated amounts paid to the ship against the actual bill, credit

or debit the vessel accordingly, with confirmation to the NRCC (Naval Regional Contracting Center)…"

29.     Akbar Khan, who served as ISS' Regional Director for Government Services in southwest Asia and Africa in 2005, was designated the PPOC (primary point of contact) for the SWA contract, and was the signatory to the contract and its subsequent amendments.

30.     In April 2007, ISS CEO Claus Hyldager hired Relator Larry Cosgriff, a former Merchant Marine officer with over 30 years of maritime experience, as Senior Vice-President of ISS Government Services, to help grow ISS' government business. In September 2007, Mr. Cosgriff was made the *de facto* head of Government Services for the Western Hemisphere. In March 2008, Mr. Cosgriff became head of Government Services world-wide. Mr. Cosgriff was subsequently promoted to Executive Vice-President of ISS Government Services in February 2009. Mr. Cosgriff reported directly to CEO Hyldager.

31.     In December 2007, Mr. Cosgriff selected Relator Andrea Ford to serve as Assistant Manager for Government Services in North & Central America. Ms. Ford was subsequently promoted to Government Services Manager for North & Central America. Mr. Cosgriff also hired Daniel Young in October 2007 as Government Services Manager for Asia-Pacific.

32.     Shortly after Ms. Ford and Mr. Young joined the Government Services Division, Akbar Khan scheduled a three-day service workshop course in Dubai for approximately 30 ISS Middle East employees, including port managers and operations representatives. In order to familiarize Ms. Ford and Mr. Young with the Government Services operations in the Middle East, Mr. Cosgriff sent them to Dubai to attend the workshop. The workshop took place in December 15-17, 2007.

33.     To the alarm of Ms. Ford and Mr. Young, during the workshop and at after-hours gatherings, high-level ISS employees, including Mr. Khan, repeatedly spoke of unlawful practices employed by ISS to inflate its invoices to the U.S. Navy and thereby increase ISS' profits. ISS Middle East employees made similar statements during a tour of ISS' facilities in Bahrain that followed the workshop. ISS employees described a number of schemes they utilized to overcharge the Navy, including:

   a. Inflating the volume of CHT removed from ships and the charges for CHT removal
      services on invoices to the Navy:

34.     Mr. Khan stated during the workshop that "playing with the volumes [of CHT] is how you make your money," advising the attending regional managers and employees to inflate the number of cubic meters of CHT removed. The assistant port manager in Bahrain described the following trick ISS used in order to give the Navy the false impression that a greater volume of CHT had been removed from the U.S. ships serviced by ISS: During the CHT removal process, ISS would move the barge into which the CHT was being pumped away from the ship, as if the barge were full and needed to be emptied – when, in fact, the barge was not full and was not being emptied, but was simply being moved away for a time. The same assistant port manager later confirmed to Ms. Ford during a dinner that ISS inflates the volume of CHT on its invoices to the Navy.

35.     During the tour of ISS's Bahrain operations that followed the workshop, a Bahrain representative told Ms. Ford, Mr. Young, and the other regional managers and employees, that ISS Bahrain adds an hourly charge to its invoices for CHT barge standby, on top of the fixed CLIN price for CHT removal, despite the fact that the fixed-price includes costs for "all equipment and facilities required to remove CHT." Another Bahrain operations

14

representative stated that ISS falsely reports the volume of CHT removed to increase profits. A

representative from ISS' Bahrain accounting department later confirmed this practice to Mr.

Young. He explained that the ISS operations manager on the pier sends the CHT vendor invoice

to the ISS accounting department. The accounting department then creates an ISS invoice with

inflated CHT quantities that is presented to and signed by the Navy's supply officer. The

accounting department employee further explained that in the event of a Navy audit, ISS is only

required to show ISS invoices, not vendor invoices. A separate file is maintained for each call

with the original vendor invoices.

    b.  Obtaining kickbacks from vendors on non-CLIN services:

    36.    Port and Operations managers for ISS' operations in Bahrain, Dubai, Abu Dhabi,

and Muscat stated that they worked with vendors to inflate the prices on vendor invoices for

goods and services provided to Navy ships, usually by 15% to 20%, and that ISS retains as profit

the difference between the inflated rate charged to the Navy and the true price. According to

statements made during the workshop and subsequent tour, this was the most common method

employed by ISS to overcharge the Navy and increase ISS profits on port calls.

    37.    Ms. Ford and Mr. Young immediately notified Mr. Cosgriff by telephone and

email of the unlawful practices in which ISS Middle East employees were engaged. Mr.

Cosgriff, in turn, contacted ISS CEO Hyldager, expressed his concern that there was substantial

evidence indicating that ISS was overcharging the Navy on the SWA contract, and urged Mr.

Hyldager to immediately hire ISS' outside counsel, the Washington D.C. law firm of Arnold &

Porter, LLC, to conduct a full investigation and recommend appropriate action.

    38.    CEO Hyldager declined to follow Mr. Cosgriff's advice. Instead, he and Simon

Tory, ISS Group Secretary, decided that ISS would conduct an internal audit of the practices

reported by Relator Ford and Mr. Young. The internal audit was overseen by ISS employee

Bharat Khadalia. An internal audit report was sent to Messrs. Hyldager and Tory on March 5,

2008.

39.     The ISS audit was limited in its scope, cursorily performed, and poorly

documented. While the March 5, 2008 audit report states that the "investigation was based on

financial records (the Dream financial software) and underlying documents such as invoices,

credit notes, delivery notes, journal entries etc.," the report did not indicate whether the auditors

had determined if ISS was maintaining double sets of invoices for CHT removal or third-party

vendor services. Similarly, while the report stated that the "review of documentation was

supplemented by enquiries made of" five ISS employees, including Akbar Khan, the report

failed to include the questions asked of these individuals and their responses. The auditors did

not interview Ms. Ford, Mr. Young, or any of the third-party vendors. The audit was restricted to

ISS' offices in Dubai and Bahrain, and the auditors' examination of discounts paid to ISS by

third-party vendors was restricted to the year 2007.

40.     Nevertheless, despite the superficiality of the audit, the auditors documented that

ISS had improperly retained approximately $5,087,000 in overpayments made by the Navy as a

result of overcharges by ISS' Dubai and Bahrain offices. The auditors determined that between

August 2005 and January 2008, ISS' Dubai and Bahrain offices billed the Navy for CHT

removal, port dues, water, waste oil, shore power, and boat hire based on estimates that proved to

be between three percent (3%) to twenty-nine percent (29%) higher than the actual charges. For

example, ISS Bahrain overbilled the Navy by 29% for CHT removal. According to the audit

report, as a result of these overbillings, the Navy overpaid ISS $5,449,000. Despite the fact that

the SWA contract required ISS to reconcile its estimated billing with actual invoices within 30

days of the ship's departure and to credit any overpayment to the Navy, the auditors determined that ISS returned to the Navy only $362,000 of the $5,449,000 in overpayments. Of the 1,510 U.S. ships serviced by ISS in Dubai and Bahrain, ISS reconciled its estimated and actual bills and returned surpluses owing for only 430 vessels. No mention was made in the report as to why ISS failed to perform any reconciliation for seventy-two percent (72%) of the Navy ships, when ISS knew that its estimated bills far exceeded its true costs.

41.     In addition to identifying the overpayments described above, the auditors determined that during 2007 alone, the Dubai and Bahrain offices received $437,000 in "volume discounts/rebates" on Navy business that were not passed on to the Navy as required under the contract. The auditors apparently accepted the word of the five ISS employees with whom they spoke that the monies paid to ISS by vendors were in fact legitimate "volume discounts" based on the volume of business ISS provided. The auditors did not attempt to probe this assertion by interviewing third party vendors or ascertaining if there were contracts memorializing the terms of the so-called "volume discounts." The report did not address why ISS failed to disclose these discounts to the Navy and pass them on as required by the SWA contract.

42.     The auditors also determined that ISS had spent about $234,000 on entertainment and promotional expenses that could constitute improper monetary arrangements with Navy officials. These expenditures included lunches, dinners, cameras, cellular phones, t-shirts, desk diaries, and other items bought by ISS for Navy officials.

43.     Mr. Cosgriff did not receive a copy of the internal audit report until May 2008, approximately two months after it was issued and sent to ISS CEO Hyldager and ISS Group Secretary Tory.

44.     After reading the report, Mr. Cosgriff questioned Mr. Hyldager about the findings, and about ISS' intention to take any corrective actions in response. Mr. Hyldager attempted to justify ISS' practice of marking up the amount of CHT removed when preparing its invoices for the Navy, contending that the vendor who removed the CHT for ISS often understated the volume of CHT it had disposed of in its invoices to ISS. Mr. Cosgriff told Mr. Hyldager that the explanation was not credible, since the vendor would have every reason to bill ISS and collect monies for all the CHT it had removed.

45.     Mr. Cosgriff also questioned Mr. Hyldager on the audit report's findings that ISS had taken "discounts" from vendors and failed to pass them on to the Navy as required by the SWA contract. Mr. Cosgriff insisted that ISS must pass on any future discounts it receives to the Navy, and that ISS should determine the amount of the discounts it had obtained from vendors and make full disclosure and repayment to the Navy. Mr. Hyldager refused to refund the "discounts" previously obtained or to stop ISS' practice of soliciting and keeping discounts from vendors.

46.     Finally, when Mr. Cosgriff inquired of Mr. Hyldager about ISS' plans to disclose the overbilling to the Government and refund the monies, Mr. Hyldager stated that the internal audit report was erroneous, and that some of the funds that were classified as "overpayments" from the Navy were instead funds that ISS was trying to hide from its joint venture partners in southwest Asia. Mr. Hyldager claimed that ISS had actually received only $1.4 to $1.6 million in overpayments from the Government, and that the company intended to refund these amounts to the Navy. Mr. Cosgriff requested that he be sent documentation evidencing the repayment as soon as the monies were repaid to the Navy. Mr. Hyldager assured Mr. Cosgriff that he would receive this documentation. Despite the fact that Mr. Cosgriff repeated this request on several

occasions, up through the time of Mr. Cosgriff's departure from ISS, no documentation or other information was ever provided to him indicating that ISS had repaid the monies owed to the Navy under the SWA contract.

47.     After receiving the audit report, Mr. Cosgriff briefed Ms. Ford on the internal audit and his conversations with Mr. Hyldager about the SWA audit, and he showed her a copy of the report.

48.     In October 2008, Mr. Cosgriff hired Relator Noah Rudolph to serve as Chief Operating Officer to the Government Services Division, effective November 10, 2008. Two of Mr. Rudolph's primary responsibilities were to implement a compliance training program for the Government Services Division and to analyze the profitability of port calls performed by the Government Services Division. At the time he hired Mr. Rudolph, Mr. Cosgriff fully informed him of the events set forth in paragraphs 32-47 above.

49.     In reviewing port calls on the SWA contract in June 2009, Mr. Rudolph determined that the profit margins for the calls were substantially higher than one would expect if ISS was adhering to the terms of the SWA contract. For example, for a 4-day call by the USS Eisenhower in Jebel Ali from April 14-18, 2009, ISS' Dubai office booked a gross profit margin of $222,788. Mr. Rudolph suspected that the ISS offices in southwest Asia were continuing to engage in the unlawful practices described above, and he informed Mr. Cosgriff of his concerns.

50.     As set forth more fully below, during their remaining tenure with ISS, both Messrs. Cosgriff and  Rudolph repeatedly and unsuccessfully urged CEO Hyldager and ISS Group CFO Chris Whiteside to stop the improper practices described above, to retain Arnold & Porter to conduct a full investigation of all violations committed by ISS in performing its contracts with the Navy, and to make full disclosure and repayment to the Navy.

D.      The Panama Contract

51.     In 2003, Defendant Inchcape Shipping Services Holdings Limited, through its
subsidiary, Defendant Inchcape Shipping Services S.A., entered into Contract N00189-04-D-
0001 (Panama contract) with the U.S. Navy to provide husbanding services for U.S. ships in
ports in the country of Panama, including the ports of Rodman, Balboa, and Colon. This
competitively bid requirements contract was effective beginning December 1, 2003 through at
least August 31, 2010.

52.     Like the SWA contract, the Panama contract requires the Contractor to provide
CLIN services, like CHT removal, at the fixed rates agreed to in the contract, and to arrange for
Port Tariff (PT) services from local port authorities and bill those services at cost. The contract
explicitly prohibits the Contractor from charging the Navy for PT services at prices "in excess
of" the rates charged by the port authority.

53.     As in the SWA contract, the Panama contract also requires the Contractor, as part
of its husbanding services, to arrange for the provision of non-priced items and services,
including FFV and other food and subsistence items, from third-party vendors. Pursuant to the
contract, ISS is paid an agreed-upon daily rate listed in the contract as "Husbanding Fees" for
providing these husbanding services. The Panama contract states that **"the Husbanding Fees set
out in Section titled, SUPPLIES OR SERVICES AND PRICES constitute total
consideration for performance of Husbanding Services..."**

54.     The Panama contract provides that the Contractor "is responsible for meeting the
highest standards of care and business judgment when assisting with purchases of ship
requirements." When arranging for FFV and other goods and services from third-party vendors,

whenever feasible, ISS must perform market surveys and provide price information from three sources to the Navy Supply Officer.

55.     To ensure that the Contractor is acting solely to promote the interests of the Navy in obtaining quality goods at the best available prices and <u>not</u> to advance its own financial interests, the Panama contract states: "The Contractor shall disclose to the Supply Officer of any ship for which the Contractor is providing services of any financial or beneficial interest the Contractor has or may have in any vendor whose supplies or services that are not otherwise covered under this contract are being proffered to the Supply Officer."

56.     Under the Panama contract, the Contractor must provide the Navy with a Final Cost Report with information and documentation for all charges paid by the ship within seven days of the ship's departure. Where a ship pays an estimated bill, the Contractor must reconcile the estimated payment against the actual bill and refund any overpayments.

57.     In January 2008, Mr. Cosgriff and David DeBoer, Vice-President for Government Services Sales and Marketing, had a meeting in Panama with Fernando Ayala, an ISS operations assistant. During this meeting, Messrs. Cosgriff and DeBoer learned that ISS was receiving kickbacks, in the form of commissions, from vendors providing FFV and other goods and services under the Panama contract. Mr. Ayala disclosed that ISS and United Supplies & Logistics, Inc. (United), its local FFV supplier, had agreed that United would mark up its invoices to the Navy by twenty-eight and one-half percent (28 ½%), and that this 28 ½% mark-up would be paid to ISS as a "commission." ISS did not report the existence of these commissions, or ISS' financial interest in United or any other vendor, to the Navy.

58.     Mr. Cosgriff briefed Ms. Ford on his conversations with Mr. Ayala in February 2008, shortly before Ms. Ford left for a business trip to Panama. While Ms. Ford was in Panama,

Mr. Ayala told her that ISS was taking discounts on FFV provisions and other vendor items. Ms. Ford told Mr. Cosgriff what Mr. Ayala had said.

59.     After looking into the issue, Mr. Cosgriff directed Ian Whelan, who was then Regional Chief Financial Officer, and Lars Westerberg, who was then Regional Managing Director for the North and Central Americas, to cease taking commissions from vendors.

60.     In October 2008, Mr. Cosgriff was notified by Regional CFO Whelan that, contrary to Mr. Cosgriff's instructions, ISS had recommenced its practice of taking commissions from United. ISS' Panama employees claimed that the 28 ½% commissions that ISS was receiving United were "early payment discounts." ISS did not disclose these discounts, or its relationship with United to the Navy.

61.     Once again, Mr. Cosgriff instructed Messrs. Westerberg and Whelan, in an email dated October 7, 2008, that "the activity in question needs to stop immediately." Mr. Cosgriff also stated that "this matter needed to be referred to [CEO] Claus [Hyldager] and [Group Secretary] Simon Tory as soon as possible" because of the "many serious potential legal ramifications associated" with it.

62.     On November 6, 2008, Mr. Cosgriff was notified that ISS had continued to take vendor commissions, and that ISS had made $37,000 in profit in October 2008 on commissions received from United.

63.     Upon learning that ISS was improperly receiving commissions in Panama, Relator Cosgriff briefed Relators Rudolph and Ford on this discovery and his concerns about ISS' practices.

64.     On November 9, 2008, Relators Cosgriff and Rudolph, and VP DeBoer met with Messrs. Westerberg and Whelan and Panama Country Manager Helge Hesto, and again

instructed them to stop taking commissions from the FFV vendor. Mr. Hesto complained that ISS would be unable to meet its planned profits if it stopped taking the commissions.

65.     In May and June 2009, Mr. Rudolph examined financial records for April and May 2009, respectively, reflecting the earnings before interest, taxes, depreciation, and amortization (EBITDA) for ISS' Government Services in Panama. Mr. Rudolph observed that the bulk of the EBITDA was classified as "Other Income." After Mr. Rudolph obtained and reviewed the underlying transaction details, he discovered that ISS was marking up items designated in the contract as Port Tariff (PT) items, often doubling or tripling the fees. The following are examples of false and inflated invoices for Port Tariff (PT) items that ISS submitted to the Navy in May 2009:

| SHIP | PT ITEM | VENDOR NAME | VENDOR INVOICE | INVOICE TO NAVY | ISS GROSS PROFIT MARGIN | ISS % MARKUP |
|---|---|---|---|---|---|---|
| USS Mitscher | Berthing GT 9200 @ 0.12 x 2 days | Panama Ports | $1,020.00 | $2,208.00 | $1,188.00 | 116.47% |
| USS Simpson | Water Taxi | Two Ocean | $275.00 | $700.00 | $425.00 | 154.55% |
| USCGC Forward | Line handlers – Docking Cristobal | Panama Ports | $250.00 | $660.00 | $410.00 | 164.00% |
| USCGC Morganthau | Berthing GT 3400 @ 0.18 (Third Period) | Petroamerica Termininal, S.A. | $40.75 | $612.00 | $571.25 | 1401.84% |

| USS Underwood | Trash removal services (Pierside) | T&C Marine | $1,780.00 | $2,800.00 | $1,020.00 | 57.30% |
|---|---|---|---|---|---|---|
| USS Warrior | Trash removal services (Pierside) | T&C Marine | $580.00 | $1,500.00 | $920.00 | 158.62% |

66.     The April and May 2009 financial data also revealed that ISS was grossly

inflating bills and submitting false claims to the Navy for canal tolls that ISS paid to the Panama

Canal Authorities for U. S. Ships. For example, in May 2009 ISS billed the Navy $7,315 for

canal tolls for the USS Warrior. It billed the Navy the identical amount for tolls for the USS

Chief.  In fact, these bills were inflated by over 100%. The Autoridad del Canal de Panama billed

ISS $3,398.34 for tolls for each ship.

67.     As set forth more fully in paragraphs 94-97 and 125-140, Messrs. Cosgriff and

Rudolph repeatedly and unsuccessfully urged CEO Hyldager and Group CFO Chris Whiteside to

stop the receipt of commissions, discounts, and other monies from vendors; to cease inflating

bills for PT and other items; to retain the Washington, D.C. law firm Arnold & Porter to perform

a full investigation of improprieties committed in connection with ISS contracts with the Navy;

and to make full disclosure and repayment to the Navy. At the time of Relators Rudolph,

Cosgriff and Ford's separations from ISS, on July 13, 2009, June 30, 2010 and September 7,

2010, respectively, these practices were continuing unabated.

68.     In October 2009, Fernando Ayala, who had been promoted to Assistant

Operations Manager for Government Services in Panama, contacted Ms. Ford by telephone.

Shortly thereafter, Mr. Ayala spoke with Mr. Cosgriff by telephone as well. Mr. Ayala told

Relators Ford and Cosgriff that he was exceedingly distraught, to the point that he could not

sleep at night, because ISS was conspiring with United, its local FFV vendor, to overcharge the Government on FFV purchases by creating and presenting phony invoices to the Navy. Mr. Ayala explained that ISS had instructed United to create a double set of invoices for Navy FFV purchases. The first set of invoices prepared by United reflected the actual prices that United charged ISS for provisions supplied to the Navy. United delivered the first set of invoices to ISS and ISS paid United the amount charged on the first set of invoices. However, pursuant to instruction from ISS, United created a second set of invoices which it entitled "delivery tickets." The delivery tickets listed the same food items as were included in the first set of invoices but the prices for these items were marked up, usually in excess of twenty percent (20%). United presented these inflated delivery tickets to the Navy supply officer when it delivered FFV provisions to Navy ships. ISS billed the Navy using the inflated charges listed in the delivery tickets. ISS pocketed the difference between the amount it billed the Navy and the amount it paid United for FFV supplies. Neither ISS nor United disclosed to the Navy the actual charges billed by United for the food provisions. Instead, ISS instructed United to create the double set of invoices in order to conceal the secret profits ISS was making when procuring FFV on behalf of the Navy.

69.     Mr. Ayala further stated that he had questioned the propriety of this practice in an email to Messrs. Westerberg and Whelan. Mr. Ayala indicated in the email that, according to his understanding of the compliance training that Mr. Rudolph had provided to him in 2009, ISS was not permitted to make a profit on non-CLIN items. Messrs. Westerberg and Whelan told Mr. Ayala to do it anyway and, furthermore, not to copy Ms. Ford or Mr. Cosgriff on any correspondence regarding the practice.

70.     At Ms. Ford's request, Mr. Ayala sent Ms. Ford samples of the invoices in

question. Ms. Ford shared these documents with Mr. Cosgriff. One set of invoices is attached to

the Complaint as Exhibit A and incorporated by reference. The invoices provided by Mr. Ayala

confirmed his statements. For example, as shown in Exhibit A, on February 3, 2010, United

invoiced ISS for $25,719.52 for FFV supplied to the USS McInerney. The United invoice listed

every food item supplied, along with the quantity and price. As also shown in Exhibit A, United,

under direction of ISS, created a "delivery ticket" which it presented to the Navy for payment in

lieu of the correct invoice, marking up each food item by approximately twenty-two percent

(22%) for a total charge of $31,352.

71.     In subsequent conversations with Ms. Ford, Mr. Ayala confided that ISS was

taking "discounts" in the vicinity of ten percent (10%) on virtually all non-CLIN goods and

services obtained from third-party vendors, including launch hires, ship spares, and hotel

bookings. Mr. Ayala said he knew that what ISS was doing was wrong, but ISS required him and

the other Panama office employees to do it anyway.

72.     After talking with Mr. Ayala, Ms. Ford examined financial data for several Navy

ship calls in Panama, including port calls by the USS McInerney (port call on October 29 -

November 3, 2009), the USS McClusky (port calls on November 19-23, 2009, and December 6,

2009), the USS Jarrett (port calls on September 5-8, 2009, and September 28- October 1, 2009),

the USS Gary (port call on September 8-11, 2009), and the USS McClusky (port call on October

19-22, 2009). Ms. Ford compared the prices on the vendors' invoices with ISS' charges to the

Navy for the very same items. Ms. Ford's comparison confirmed that ISS had consistently

submitted false claims to the Navy in which it charged the Navy significantly more than ISS'

cost for the items, in blatant violation of the Panama contract with the Navy. In fact, profits from

these illegal mark-ups accounted for 10% to 32% of ISS' gross profits on these calls. The financial data for these ships also reflected that ISS was marking up invoices and submitting false claims to the Navy for non-CLIN items from other vendors, such as launch hire, ship spares, and repairs.

73.     For example, Ms. Ford's review of the gross profit margins for the USS McInerney (port call on October 29 -November 3, 2009) revealed that of the $7,365 in gross profits booked, only $1,356 was attributable to services and items on which ISS was allowed under the contract to make a profit. The remaining profits were for Port Tariff (PT) and non-CLIN items which, under the terms of the Contract, ISS was required to procure for the Navy at cost. Per the Panama contract, the daily husbanding fees paid to ISS "constitute total consideration for performance of Husbanding Services." Nevertheless, ISS marked up invoices and submitted false claims to the Navy for these PT and non-CLIN items and services and pocketed approximately $6,000 in profits at the Navy's expense.

74.     Ms. Ford reported her findings on these overcharges on the Panama contract to Mr. Cosgriff. In subsequent conversations between Mr. Ayala and Ms. Ford, including conversations on June 6, 2010 and September 3, 2010, Mr. Ayala confirmed that ISS was continuing its practice of making profits on non-CLIN and PT items by taking "discounts" from vendors on non-CLIN and PT items and submitting inflated invoices to the Navy to conceal these discounts, as described in paragraphs 68-73 above. Ms. Ford reported these conversations to Mr. Cosgriff.

E.     The Africa Contract

75.     In July 2004, Defendant Inchcape Shipping Services Holdings Limited, through its subsidiary, Defendant Inchcape Shipping Services Dubai LLC, entered into Contract

27

N68171044034 (Africa contract) to provide husbanding services for U.S. ships in Africa, effective from July 15, 2004 through at least March 31, 2012.

76.     Like the SWA and Panama contracts, the Africa contract required the Contractor to provide CLIN services, like CHT removal, at the fixed rates agreed to in the contract, and to procure Port Tariff (PT) and non-CLIN goods and services from local port authorities and third-party vendors and bill those services to the Navy at cost.

77.     The Africa contract provides that the daily husbanding fees agreed to in the contract cover **"arranging supplies and services described herein. The Fees represent total compensation for the contractor except for supplies and services with Fixed Prices.  Any other compensation in the form of rebates, discounts, etc., shall be credited to the U.S. Navy."** (N6817104D4034 Statement of Work, A(2)(c), emphasis added.)

78.     The Africa contract also contains the same provisions as the SWA contract regarding payment of estimated bills, the requirement that fixed prices be inclusive of everything needed (*i.e.* tugs, barges, etc.), and the requirement that the CHT price include all equipment and facilities.

79.     Akbar Khan, who first served as the Regional Director for Government Services in southwest Asia and Africa, and was promoted by CEO Hyldager in December 2008 to Vice-President for Government Services in southwest Asia and Africa, oversaw the Africa contract.

80.     From October 4-7, 2008, three U.S. Navy ships made calls in South Africa: the USS Theodore Roosevelt (a large aircraft carrier), the USS Monterrey, and the USNS Supply (hereinafter referred to as the "TR call").

81.     On October 2, 2008, prior to the arrival of these ships, Mr. Cosgriff emailed Akbar Khan and his employees, as well as Ms. Ford. In this email, Mr. Cosgriff quoted the

contract language set forth in paragraph 78 above, prohibiting ISS from taking a profit for arranging non-CLIN goods and services and requiring ISS to pass on all vendor discounts and rebates to the Navy.

82.     Mr. Cosgriff requested that Ms. Ford join ISS' team in South Africa for the TR call so that she could assist in the call and watch out for possible improprieties.

83.     ISS Vice-President Akbar Khan, Contracts Administrator Sam Tarapore, Manager Madhu Gopinath, Sree Chander (one of the Mr. Khan's operations and accounting employees), and others, including Ms. Ford, arrived in South Africa several weeks before the TR call to train ISS' local staff on handling the call. During this training, Messrs. Khan and Gopinath told the ISS staff that any vendor selected to supply goods and services to the Navy ships would have to provide ISS with a "discount" of at least ten percent (10%), which ISS would keep as profit

84.     Ms. Ford challenged these instructions in conversations with both Mr. Chander and Mr. Tarapore, stating that, per the Africa contract, ISS was not permitted to keep any discounts or commissions. Both men told Ms. Ford that she did not understand the contract and to mind her own business. Mr. Chander also informed Ms. Ford that Messrs. Khan and Gopinath had given their staff standing instructions that they were to demand "discounts" from vendors in all the ports in Mr. Khan's region. Mr. Chander, who oversaw all invoicing to the Navy on the call, including invoicing of goods and services provided by third-party vendors, refused to allow Ms. Ford to see any of the invoices for the TR call.

85.     On October 4, 2008, Mr. Khan took Ms. Ford, as well as two Navy personnel overseeing the TR call, out for dinner. Contrary to an instruction Mr. Cosgriff had given to all the Government Services employees, Mr. Khan paid the bill for the Navy personnel. One of the

Navy employees who attended the dinner later told Ms. Ford that he loved going to dinner with Akbar [Khan] because Akbar always picked up the bill.

86.     After Mr. Khan included the dinner expenses on his company expense report, Mr. Cosgriff advised him in an email dated November 28, 2008 that "ISS personnel cannot entertain USG officials, nor can ISS expense such entertainment. It is EXTREMELY important that these rules be strictly observed from here on out. Failure to do so will result in disciplinary action."

87.     After the departure of the Navy ships on the TR call, Mr. Cosgriff requested that Mr. Khan provide him with a reconciliation of the TR call so that Mr. Cosgriff could review and assess its profitability.  Mr. Khan ignored this request. In an email to Mr. Khan dated October 15, 2008, Mr. Cosgriff wrote "a friendly reminder" that he was expecting the detailed accounting data for the TR call.  Mr. Cosgriff also requested the following:

> Please indicate if any rebates, commissions and/or discounts were provided to ISS by vendors on any of the invoiced amounts and the current disposition of those rebates, commissions and/or discounts, i.e., identify by CLIN those by ISS or those passed-on to the ship(s).

88.     Mr. Khan did not comply. On November 28, 2008, Mr. Cosgriff again wrote to Mr. Khan to request the same information. Mr. Khan refused to send the requested information by email. Instead, Mr. Khan arranged to have ISS Group CFO Chris Whiteside deliver a hard copy of several spreadsheets to Mr. Cosgriff at an ISS Group Planning meeting outside London on December 9, 2008. After receiving the documents, Mr. Cosgriff requested that Mr. Khan provide an electronic copy of spreadsheets to aid in the analysis. Mr. Khan refused, writing on December 10, 2008 that "The whole idea to give this to CW [CFO Chris Whiteside] to hand over to you in London was to avoid email." In reply, Mr. Cosgriff stated he was "puzzled" by Mr. Khan's refusal to send the information by email.

89.     The spreadsheets provided by Mr. Khan stated that ISS's gross profit on the TR call was $340,160.94. Of that, $132,166.89 – about 39% – was attributed to "Supplier Discounts" that ISS had failed to pass on to the Navy.

90.     Mr. Rudolph analyzed the spreadsheets together with the Africa contract and pricing schedule. His review revealed that, once again, ISS had submitted false claims to and significantly overcharged the Navy in numerous ways, including:

    a.  For numerous fixed-price items, ISS charged the Navy significantly more
        than the agreed-upon price in the contract. For example, ISS invoiced the
        Navy for vehicle rentals at a rate that was substantially higher than the day
        rate agreed to in the contract, resulting in an overcharge of approximately
        $31,000;

    b.  ISS marked up vendor invoices for numerous unpriced items in the contract
        and failed to pass on vendor discounts to the Navy. Unpriced items that
        should have been billed to the Navy at cost, but instead were marked up,
        included Cargo Barges, Portable Toilets, Local Supplies, South African
        Tours, Brow Hire, Crane Hire, Spares Cleaning, Forklift Hire, Oily Waste
        Removal, Hotel and Air Ticket Charges, and Money Exchange Services.

    c.  ISS double-charged the Navy for certain CLIN services by charging the
        CLIN fixed price and then adding charges in its bill to the Navy for
        additional services that should have been included, per the contract, in the
        CLIN fixed-price charges;

    d.  ISS failed to reconcile estimated and actual units of services provided and
        to refund the resulting overpayments.

91.     In subsequent conversations among Relators Cosgriff and Rudolph, and Mr. Khan, Mr. Khan provided conflicting and unsubstantiated explanations for the various overcharges.

92.     In an email to Mr. Khan dated January 16, 2009, and copied to ISS Group Company Secretary Simon Tory, Mr. Rudolph advised Mr. Khan that the Anti-Kickback Act "applies universally" to all ISS contracts with the Navy.

93.     On January 19 and 20, 2009, respectively, Relator Rudolph sent an email to ISS Group Company Secretary Simon Tory, and then a follow-up email to CEO Hyldager and Group CFO Chris Whiteside, alerting them to the serious concerns arising from the billings to the Navy on the TR call. At the time, Mr. Cosgriff was recovering from medical issues. Mr. Hyldager replied:

> have been a bit strapped for time-will look into the matter and revert with my comments.  In the meantime no action from your end is required.

94.     On February 26, 2009, Mr. Cosgriff and his VP for Sales and Marketing, David DeBoer, held a conference call with Messrs. Hyldager and Whiteside. In this telephone conversation, Mr. Cosgriff stressed that ISS must comply with its contractual obligation and the newly-enacted Mandatory Disclosure Rules of the Federal Acquisition Regulations, set forth in paragraph 20 above, by promptly refunding all overpayments to the Navy and disclosing any improper billing practices. Mr. Cosgriff again urged Mr. Hyldager to retain the Washington DC law firm of Arnold & Porter to do a thorough investigation and determine what repayments and disclosures must be made to the Government. In response, Mr. Hyldager warned Mr. Cosgriff that ISS' Government Services Division might not remain financially viable if ISS were to comply with its

contractual obligations and return all overpayments to the Navy. Mr. Hyldager also stated that if the Navy audited ISS, the auditors would find only the invoices that matched the amounts that were billed to the Navy.

95.     On March 4, 2009, Mr. Cosgriff sent an email to Akbar Khan, Allan Vermaak (Senior Vice President for Africa), Madhu Gopinath, Simon Tory, and Relator Rudolph regarding the TR call. Mr. Cosgriff stated that since ISS had received discounts on "unpriced" items in the contract, ISS was contractually obligated to pass these discounts on all three ships to the Navy. He outlined the following next steps in this process: "review all invoices for the [three] calls, determine which of these items [was] unpriced and return any discounts to the Navy." Mr. Cosgriff urged ISS to act quickly, writing that "[a]s this call took place in October 2008, time is now of the essence to close-out this call and return the discounts to the USN per the contract." Mr. Cosgriff stated that Relator Rudolph would "lead the effort."

96.     In response, Mr. Hyldager "suggested" in an email to Mr. Cosgriff on March 5, 2009, that Mr. Cosgriff consider "what long term financial impact your actions [in urging this reconciliation] could have." The implication was clear that ISS did not want Mr. Cosgriff to carry out this reconciliation because it would hurt the company's profits. Mr. Cosgriff responded on March 9, 2009, that the company was required to pass the discounts on to Navy. Mr. Cosgriff warned:

> Keeping the discounts on unpriced items from the TR is not an option for ISS and never was.  To do so would be wrong.  It would also potentially expose the company to claims by the Navy for a.) breach of contract b.) filing a false claim with the government and c.) potentially, prosecution under both the Anti-Kickback Act and the False Claims Act.
>
> The negative consequences for ISS could include:
> -claims for monetary damages

-civil fines and penalties
Suspension and/or debarment of the company from existing and future contracts
-criminal prosecution of the company and/or its management
-severe damage to the company's reputation with the US government and our commercial customers.

Furthermore, Akbar's failure to follow the government gift rules potentially exposed himself—and the company—to additional penalties

97.    Between April 2 and April 27, 2009, Mr. Rudolph sought, with limited success, to obtain the actual invoices for the TR call from ISS' Dubai office. The Dubai office quickly backpedalled on the $340,160.94 profit figure previously reported by Mr. Khan and now claimed, without a credible explanation, that the profits had shrunk by almost $200,000. Some employees in the Dubai office even claimed that ISS may have lost money on the call. Contrary to the statements of the Dubai employees, ISS' internal accounting system continued to show a profit in excess of $300,000 for the TR call.

98.    In an email on April 24, 2009 to Mr. Cosgriff, Mr. Rudolph stated that, based on his preliminary review, the overcharge on the TR call was approaching $180,000, but additional work needed to be done before the results could be finalized.

99.    On May 29, 2009, CEO Hyldager removed all responsibility for addressing the billing issues arising from the TR call from Relators Cosgriff and Rudolph. Mr. Hyldager stated in an email to Mr. Cosgriff: "I am working with Internal Audit to get clarity so the matter will be dealt with/handled from here for the time being. I will contact you should I/Bharat require any info etc." Neither Messrs. Cosgriff nor Rudolph was ever informed of the results of the internal audit, or even if an audit in fact took place.

100.    In July 2009, Relators contacted the Federal Bureau of Investigation to inform the Government of ISS' fraudulent conduct, as set forth in the Complaint.

34

Thereafter, the Department of Justice commenced an investigation into ISS' billing practices.

101.     In or about April 2010, after receiving a request for documents from the Department of Justice, CEO Hyldager directed Allan Vermaak, ISS' Senior Vice President for Africa, to destroy records the Government was seeking on the TR port call.

102.     Specifically, in a meeting at ISS' headquarters in London in April 2010, Mr. Hyldager discussed the Government's subpoena with Mr. Vermaak and questioned him about the services provided and invoices submitted to the Navy on the TR call. In response, Mr. Vermaak informed Hyldager that the TR call was primarily handled by Akbar Kahn and his team from Dubai rather than by Mr. Vermaak's Cape Town staff. Mr. Vermaak then volunteered that the records relating to the port call still resided on a laptop in ISS' Cape Town offices.

103.     Mr. Hyldager instructed Mr. Vermaak to review the records on the laptop, to fax rather than email him the answers to the questions posed, and then to dump the laptop in the ocean. When Mr. Vermaak questioned whether he had heard the final order correctly, Mr. Hyldager confirmed that he wanted the laptop destroyed.

F.     <u>North and South America Contracts</u>

104.     Defendants have employed schemes similar to those set forth in paragraphs 22-104, above, to overcharge the Government on its other husbanding contracts for servicing U.S. ships in ports throughout the world. The following are additional examples of Defendants' fraudulent billing activities and the false claims it submitted to the Navy.

Peru

105.    Defendant Inchcape Shipping Services Holdings Limited, through its

subsidiary, Defendant Inchcape Shipping Services S.A entered into Contract

N0018902R0020 ( "Peru contract") to provide husbanding services for U.S. ships in Peru

from July 2002 through August 31, 2010. The Peru contract, like the other husbanding

contracts discussed above, requires ISS to provide PT items and non-CLIN goods and

services to the Navy at cost. The contract also specifies that the Husbanding Fees agreed

to by ISS constitute total consideration for its performance of Husbanding Services.

106.    From June 6-16, 2008, the USS Boxer called at Callao and Huacho, Peru

on a humanitarian mission. Following the call, Mr. Rudolph noticed that ISS had booked

exceedingly high earnings before interest, taxes, depreciation, and amortization (EBITDA)

on the call – $354,000. Mr. Rudolph requested that the ISS Peru office send him a

breakdown of the specific items that generated these profits.

107.    Upon receipt of the breakdown, Mr. Rudolph discovered that, once again, a

large portion of ISS' profits came from illegal billing of non-CLIN and PT items, which

ISS was required under the Peru contract to bill to the Navy at cost. For example, ISS

failed to adhere to the Peru contract provisions requiring it to arrange for fuel supplies

from World Fuel Services, the local fuel supplier that held a contract with the U.S.

government to supply the fuel, and then bill such supplies to the Navy at World Fuel

Service's invoice price.  Instead, ISS obtained the fuel for the ship from another vendor,

PetroPeru, marked up the invoice for the fuel by over $50,000 and submitted this false

claim to the Navy.

108.    Mr. Rudolph also discovered that ISS had taken $130,000 from the profits it made on the USS Boxer call and placed the money in a "confidential reserve."

109.    Mr. Rudolph reported his findings on the overcharges on the Peru contract to Mr. Cosgriff, who, in turn, told Ms. Ford what had transpired.

Mexico

110.    Defendant Inchcape Shipping Services Holdings Limited, through its subsidiary, Defendant Inchcape Shipping Services S.A., entered into Contract N0024-05-D-0006 (Mexico contract) to provide husbanding services for U.S. ships in Mexico from October 2004 through September 30, 2010. The Mexico contract requires ISS to provide PT items, non-CLIN items, and items with publicly established rates (such as telephone service) at cost.  The contract specifies that the Husbanding Fees agreed to by ISS constitute total consideration for the performance of Husbanding Services.

111.    Throughout 2009, Ms. Ford periodically received financial data for calls in Mexico from ISS Mexico Country Manager Octavio Armas. Beginning in January 2010, after speaking with Panama manager Fernando Ayala about ISS' unlawful billing practices under the Panama contract, Ms. Ford re-examined the financial data she had previously received for 20 or more calls made by Navy ships to ports in Mexico during 2009 to determine if ISS was violating the Mexico contract and submitting false claims to the Navy in ways similar to its violations of the Panama contract. She determined that ISS was overcharging the Navy for PT and telephone services, often by ten and twenty fold. The following are examples of false and inflated ISS charges for PT and telephone services submitted to and paid by the Navy under the Mexico contract:

| Ship | Port | Date | Item | Vendor Invoice Amount | Invoice to Navy Amount | ISS Gross Profit Margin | ISS % Markup |
|------|------|------|------|------|------|------|------|
| USS Chief | Cozumel | March 14-17, 2009 | 0011AA Pilots | $72.60 | $2,000 | $1,927.40 | 2654.82% |
| USS Warrior | Cozumel | March 14-17, 2009 | 0011AA Pilots | $72.60 | $2,000 | $1,927.40 | 2654.82% |
| USS Champion | Mazatlan | May 17, 2009 | 0011AA Pilots | $98.72 | $2,000 | $1,901.28 | 1925.93% |
| USS Devastator | Mazatlan | May 17, 2009 | 0011AA Pilots | $98.72 | $2,000 | $1,901.28 | 1925.93% |
| USS Pioneer | Mazatlan | May 17, 2009 | 0011AA Pilots | $98.72 | $2,000 | $1,901.28 | 1925.93% |
| USS Warrior | Acapulco | April 3-5, 2009 | 0011AA Pilots | $800 | $2,000 | $1,200 | 150.00% |
| USS Chief | Acapulco | April 3-4, 2009 | 0011AA Pilots | $800 | $2,000 | $1,200 | 150.00% |
| USS Warrior | Acapulco | April 3-5, 2009 | 015AF Airtime/Long Distance | $230.05 | $350 | $119.95 | 52.14% |
| USS Sentry | Mazatlan | August 31 – September 4, 2009 | 015AF Airtime/Long Distance | $153.85 | $400 | $246.15 | 159.99% |

112.    Ms. Ford also determined that ISS was submitting false claims to the Navy for fixed-priced items at rates that exceeded the contract prices. For example, the Mexico contract states that the fixed price for a 12 to 15 passenger van in the port of Cozumel is $250 per day. However, ISS charged the Navy $550 per day for 12- to 15-passenger vans provided to the crew of the USS Chief during the ship's call in Cozumel on March 14-17, 2009. Similarly, for the USS Champion's call in Mazatlan on May 17, 2009, ISS charged the Navy $180 per Line Handler, instead of the contract price of $30 per Line Handler.

113.   Finally, Ms. Ford determined that ISS was profiting from non-CLIN services it brokered from third-party vendors in Mexico, in violation of the Mexico contract.

114.   Ms. Ford reported her findings on the overcharges on the Mexico contract to Mr. Cosgriff.

The United States

115.   Defendant Inchcape Shipping Services Holdings Limited, through its subsidiary, Defendant ISS Marine Services, Inc., entered into Contract N0024405D-0014 (West Coast contract) in November 2010 to provide husbanding services for U.S. ships in the ports of San Francisco, California, Portland and Astoria, Oregon, Seattle and Longview, Washington, and Anchorage, Juneau, Seward, and Sitka, Alaska.

116.   The West Coast contract, like the other husbanding contracts described above, requires ISS to provide PT items, non-CLIN items, and items with publicly established rates (such as telephone service) at cost. The contract specifies that the Husbanding Fees agreed to by ISS constitute total consideration for the performance of Husbanding Services.

117.   Pursuant to the West Coast contract, ISS must reconcile estimated bills with actual bills and refund any overpayments to the Navy. ISS also must disclose to the Navy any financial or beneficial interest that ISS has with any vendor providing non-CLIN supplies or services.

118.   During the course of her employment with ISS, Relator Ford learned that ISS was failing to return significant overpayments made by the Navy for ships serviced under the West Coast contract. For example, in March 2009, Ms. Ford asked Angela

Burrows, ISS's Government Accounts Coordinator in Virginia Beach, to reconcile estimated bills with actual bills for port services provided by ISS to the USS Bonhomme Richard and the USS Pinckney. Ms. Burrows determined that ISS had overbilled the USS Bonhomme Richard and the USS Pinckney port calls by $14,376 and $6,495.41 respectively. In emails dated March 23, 2009, attached and incorporated in this complaint as Ex. B, Ms. Ford provided the reconciliation to her supervisors, Ian Whelan and Mike Mason, and offered to deliver refund checks to the ships' personnel. Mr. Mason informed Ms. Ford that ISS did not intend to refund the overpayment.

119.    Ms. Ford also learned that ISS was violating the conflict of interest provisions of the West Coast contract by not disclosing its financial relationship with vendors that ISS selected to provide services under the Contract. For example, ISS did not inform the Navy that it owned Harbor Couriers, a delivery company that ISS routinely hires to make deliveries to Navy ships.

120.    Under its Navy contracts, ISS is permitted to bill the Navy for bank charges it incurs for services provided to the Government. However, on February 24, 2010, an employee in ISS' Mobile office suggested to Ms. Ford that ISS was charging the Navy amounts in excess of the actual bank fees paid by ISS.

121.    In September 2010, Rohit Sharma, ISS General Manager, Global Operations, Government Services, informed Ms. Ford that ISS was continuing to submit false and inflated invoices to the Navy on its husbanding contracts. For example, Mr. Sharma told Ms. Ford that the company's Seattle office was using Williams Dimond & Co., an ISS-owned company, to inflate invoices for husbanding services. According to Mr. Sharma, ISS would hire a company to provide services such a line handling to U.S.

Government-owned ships and, after receiving the vendor's invoice, it would create and submit to the Navy an inflated invoice for these services under the William Dimond company name. Mr. Sharma also reported that the Government Services Operations Manager for North and Central America had disclosed to him that local port offices in the United States were continuing to take and retain unallowable discounts and commissions on services provided and billed to the Navy.

122.    Mr. Sharma further informed Ms. Ford that he disclosed these improper billing practices to ISS Vice-President Dan Bryant who declined to take action. When Mr. Sharma told Mr. Bryant that he intended to disclose these violations to the appropriate Navy officials, Bryant contacted CEO Hyldager who, in turn, advised ISS Manager Madhu Gopinath of the situation. Mr. Gopinath informed Mr. Sharma that he had been instructed by CEO Hyldager that if he couldn't "tame" Mr. Sharma, he should get rid of him. Mr. Bryant also told Mr. Sharma to stand down and not to take further action.

123.    Ms. Ford reported ISS' unlawful billing practices on the West Coast contract, as described above, to Mr. Cosgriff.

## ISS' REFUSAL TO STOP OVERBILLING THE NAVY AND RETURN THE OVERPAYMENTS RECEIVED

124.    On April 7, 2009, Messrs. Cosgriff and Rudolph met with CEO Hyldager in Tyson's Corner, Virginia and discussed ISS' compliance with its Navy contracts.

125.    In the April 7, 2009 meeting, Mr. Hyldager maintained that he would support the efforts of Messrs. Cosgriff and Rudolph to ensure that ISS complied with its contractual obligation going forward, but indicated that he was reluctant to return the past profits that ISS had improperly received. Mr. Hyldager expressed his concern that the

41

amount of ISS' ill-gotten gains was significant. He asked Messrs. Cosgriff and Rudolph if it could be "10, 20, 30, 40 million?"

126.    In the April 7, 2009 meeting, Messrs. Cosgriff and Rudolph informed CEO Hyldager that ISS' field offices were holding back information on how ISS was making its profits on Navy calls; accordingly, the scope of the problem could not be determined.

127.    In the April 7, 2009 meeting, Mr. Hyldager inquired how ISS' Government Services Division intended to make up the money that would be lost if ISS complied with its contractual obligation. Mr. Rudolph responded that there was no plan in place to make up this loss.

128.    Throughout the foregoing conversation, Messrs. Cosgriff and Rudolph counseled CEO Hyldager that ISS had no alternative other than to return to the Navy the significant overpayments it had obtained. They pointed out that the Mandatory Disclosure Provisions of the Federal Acquisition Regulations required ISS to make full disclosure of ISS' improper billings. Mr. Cosgriff also expressed concern that Akbar Khan, Vice-President for Government Services in southwest Asia and Africa, had repeatedly violated Mr. Cosgriff's explicit prohibition against taking rebates, discounts and commissions from vendors and entertaining Navy personnel.

129.    In response, Mr. Hyldager stated that people within ISS were of the opinion that the Government Services team "was working for the US government." Mr. Hyldager also stated that when he informed ISS' Board of Directors that the company was marking up "unpriced" (non-CLIN) items, one board member replied that charging the Navy more than what was paid to a supplier was simply the "margins."

130.   Mr. Hyldager told Messrs. Cosgriff and Rudolph that if the Navy audited ISS, the auditors would find only the invoices that matched the amounts that were billed to the Navy. Messrs. Cosgriff and Rudolph explained that the auditors would uncover ISS' improper billing practices by reviewing records reflecting the actual payments made to the vendors, rather than the invoices in ISS' files.

131.   Mr. Rudolph informed Mr. Hyldager of the suspiciously high amount of profit—over $300,000—that ISS made on the USS Boxer call in Peru. Mr. Hyldager acknowledged that the profit was "unusual" and promised to look into it.

132.   Throughout the meeting, Mr. Hyldager reiterated that he needed to consider ISS' financial position in determining a plan of action and that he would handle the matter his own way. Mr. Hyldager also expressed dissatisfaction with the high overhead of the Government Services Division and questioned the viability of the Division under its present structure. Mr. Hyldager's remarks lead Messrs. Cosgriff and Rudolph to conclude that their jobs as well the jobs of other members of Mr. Cosgriff's team were in jeopardy.

133.   Mr. Cosgriff urged Mr. Hyldager to discuss ISS' billing issues with Arnold & Porter, ISS' outside counsel, while Mr. Hyldager was in Washington, D.C. Mr. Hyldager replied that he needed to return and meet with Group CFO Chris Whiteside, Regional CFO Arvinder Singh and Regional Managing Director Chris Stone, in Dubai to determine the scope of the problem. Mr. Hyldager promised to return Washington DC within a few weeks to consult with Arnold & Porter and determine a path going forward.

134.   On April 28, 2009, Mr. Rudolph requested information from Naval Contracting Officer Rick Bauer on billing for items marked "reserved" in the Africa contract.

135.   Later that same day, CEO Hyldager sent an irate email to Mr. Cosgriff, chastising him for permitting Mr. Rudolph to speak with Mr. Bauer on billing issues. Mr. Hyldager forbade Mr. Cosgriff and his staff from speaking with any attorney or government representative on billing questions without Mr. Hyldager's explicit authorization.

136.   Mr. Hyldager did not return to Washington D.C. as promised to meet with Arnold & Porter.

137.   Following the April meeting and email exchange described in paragraphs 124-135 above, Messrs. Cosgriff and Rudolph were excluded from all high-level decision-making.

138.   On July 13, 2009, Mr. Rudolph resigned from ISS.

139.   In an email to Mr. Cosgriff dated October 16, 2009, Mr. Hyldager wrote:

…it would appear that we do not agree on the "modus operandi" within a number of your areas of responsibility and rather than ending up in a "train smash" I believe that both you and ISS is best served by finding a mutual agreeable solution whereby we come to an agreement regarding your future employment with ISS.

140.   On October 28, 2009, ISS Vice-President Dan Bryant assumed supervisory responsibility for the Government Services Division.

141.   On December 31, 2009, Mr. Cosgriff left ISS. His official separation became effective on June 30, 2010.

142.   In January 1, 2010, Relator Ford was transferred from Government Services operations to business development.

143.   In April 2010, Ms. Ford attended a series of meetings in Mobile, Alabama with ISS senior management and Government Services personnel to finalize bid proposals

for eight new husbanding contracts the Navy intended to award in North, Central and South America. The effort was led by ISS Senior Vice-President Akbar Kahn, who had been tasked with implementing the ISS' Government Services Southwest Asia "business model" globally.  Attendees at the meeting included Ian Whelan, then Chief Financial Officer, Western Hemisphere and Lars Westerberg, then Senior Vice-President for North & Central America.

144.    It was apparent to Ms. Ford that Mr. Kahn's strategy was to win these contracts by low-balling the proposed prices on fixed-priced items and to make up any losses once the contracts were awarded by overcharging the Navy on food supplies and other items and services which were required to be provided at cost. In email exchanges, meeting participants discussed how ISS would make "good profitability" on food and fuel supplies and other incidentals. In discussing Akbar Kahn's strategy, CFO Whelan stated to Ms. Ford that he knew that "Akbar" was "a snake" but that he was "our snake."

145.    Ms. Ford resigned from ISS on September 17, 2010.

## COUNT I:  Knowingly Presenting False Claims
### (31 U.S.C. § 3729(a)(1) (2008), § 3729(a)(1)(A) (2009))

146.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 145, as if fully set forth herein. This Count is a civil action against Defendants for violating 31 U.S.C. § 3729(a)(1) (2008) and 31 U.S.C. § 3729(a)(1)(A) (2009).

147.    Defendants have knowingly presented, or caused to be presented, false claims for payment to officials or employees of the United States Government, in connection with Defendants' Government contracts to provide husbanding services to U.S. ships throughout the world.

148.    Because of the Defendants' conduct under this Count, the United States has suffered actual damages exceeding $50 million.

## COUNT II:  False Statements or Records
### (31 U.S.C. § 3729(a)(2) (2008), § 3729(a)(1)(B) (2009))

149.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 145, as if fully set forth herein. This Count is a civil action against Defendants for violating 31 U.S.C. § 3729(a)(2)(2008) and 31 U.S.C. § 3729(a)(1)(B)(2009).

150.    In connection with Defendants' Government husbanding contracts, Defendants have knowingly made or used, or caused to be made or used, false statements for the purpose of getting false or fraudulent claims paid or approved by the Government. These statements include, among others, false invoices, false delivery tickets, false statements regarding Port Tariff rates, false cost estimates, false Final Cost Reports and false reconciliation reports, along with other written and oral representations related to these items. The false statements were material to the Government's decisions to make or approve payments on Defendants' false claims.

151.    Because of the Defendants' conduct under this Count, the United States has suffered actual damages exceeding $50 million.

## COUNT III:  Violation of "Reverse" False Claims Provision
### (31 U.S.C. § 3730(a)(7) (2008) 31 U.S.C. §3729(a)(1)(G)(2009))

152.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 145, as if fully set forth herein. This Count is a civil action against Defendants for violating 31 U.S.C. § 3729(a)(3)(2008) and 31 U.S.C. §3729(a)(1)(G)(2009).

153.    Defendants knowingly made, used, or caused to be made or used false records or statements, including false invoices, false delivery tickets, false statements regarding Port Tariff

rates, false cost estimates, false Final Cost Reports and false reconciliation reports, to conceal, avoid, or decrease obligations to pay or transmit money to the Government in connection overpayments received from the Government under Defendants' husbanding contracts.

154.    Defendants knowingly made, used, or caused to be made or used false records or statements, including false invoices, false delivery tickets, false statements regarding Port Tariff rates, false cost estimates, false Final Cost Reports and false reconciliation reports, that were material to Defendants' obligation to pay or transmit money to the Government in connection with overpayments received from the Government under Defendants' husbanding contracts.

155.    Because of Defendants' conduct, the United States has suffered actual damages exceeding $50 million.

### COUNT IV:  Violation of "Overpayment" False Claims Provision
### § 3729(a)(1)(G) (2009)

156.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 145, as if fully set forth herein. This Count is a civil action against Defendants for violating 31 U.S.C. §3729(a)(1)(G) (2009).

157.    Defendants knowingly concealed and/or knowingly and improperly avoided and decreased their obligations to pay or transmit money to the Government, including overpayments received from the Government under Defendants' husbanding contracts.

158.    Because of Defendants' conduct, the United States has suffered actual damages exceeding $50 million.

### COUNT V:  Conspiracy to Submit False Claims
### (31 U.S.C. § 3730(a)(3) (2008), § 3729(a)(1)(C) (2009))

159.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 145, as if fully set forth herein. This Count is a civil action against Defendants for violating 31 U.S.C. § 3729(a)(3)(2008) and 31 U.S.C. § 3729(a)(1)(C)(2009).

160.    Defendants conspired with third-party vendors providing supplies and services to U.S. ships, including United Supplies & Logistics, Inc., to defraud the Government by getting false or fraudulent claims paid under Defendants' husbanding contracts with the United States. Defendants specifically intended for the Government to pay false or fraudulent claims, and the conspiracy involved actions that were material to the Government's decision to pay such claims.

161.    Because of Defendants' conduct under this Count, the United States has suffered actual damages exceeding $50 million.

### COUNT VI:  Conspiracy to Make False Statements and Records
### (31 U.S.C.  § 3729(a)(1)(C) (2009))

162.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1 through 145, as if fully set forth herein. This Count is a civil action against Defendants for violating 31 U.S.C. § 3729(a)(1)(C)(2009).

163.    Defendants conspired with third-party vendors providing supplies and services to U.S. ships, including United Supplies & Logistics, Inc., to knowingly make and use false statements and records, including false invoices and delivery tickets, for the purpose of getting false or fraudulent claims paid or approved by the Government under Defendants' husbanding contracts with the United States. The false statements and records were material to the Government's decisions to make or approve payments on Defendants' false claims.

164.    Because of Defendants' conduct under this Count, the United States has suffered actual damages exceeding $50 million.

## PRAYER FOR RELIEF

Plaintiffs demand judgment against the Defendants as follows:

a. That by reason of the violations of the False Claims Act, this Court enter judgment in favor of the United States and against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

b. That Plaintiffs, as the *qui tam* Relators, be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act or any other applicable provision of law;

c. That the Relators be awarded all costs of this action, including reasonable attorney's fees and court costs; and

d. That Plaintiffs have such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand that this matter be tried before a jury.

Janet L. Goldstein, Bar No. 444861
VOGEL, SLADE & GOLDSTEIN, LLP
1718 Connecticut Ave., N.W., 7th Floor
Washington, D.C. 20009
Tel. 202-537-5900/ Fax 202-537-5905
E-mail: jgoldstein@vsg-law.com

Debra S. Katz, Bar No. 411861
KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Ave., N.W., 6th Floor
Washington, D.C. 20009
Tel. 202-299-1140/ Fax 202-299-1148
E-mail: katz@kmblegal.com

Alison Asarnow, Bar No. 984312
KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Ave., N.W., 6th Floor
Washington, D.C. 20009
Tel. 202-299-1140/ Fax 202-299-1148
E-mail: asarnow@kmblegal.com

Attorneys for Relators Noah Rudolph, Andrea Ford and
Lawrence Cosgriff

Dated: August 18, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2014, I served a true copy of the foregoing

First Amended Complaint by e-mail and by first class mail (postage prepaid) addressed to:

Mr. Brian Hudak
Assistant United States Attorney
United States Attorney's Office
555 4th Street NW
Washington, DC 20530
[E-mail: Brian.Hudak@usdoj.gov]

Mr. Robert Chandler
U.S. Department of Justice
Civil Division, Commercial Frauds Section
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
[E-mail: Robert.Chandler@usdoj.gov]

50

# RECEIVED

## United Supplies & Logistics, Inc.

R.U.C. 784609-1-489219 D.V. 36
Vía Domingo Díaz
Centro Empresarial Los Diamantes #6
Telefax: (507) 290-5295

**Invoice  Nº  02808**

3 FEB 2010

1 5 ENE 2000

INCHCAPE SHIPPING
INCHC SERVICES RVICES

| Customer | Customer Address | Customer Phone | Date |
|---|---|---|---|
| USS McInerney | C/O Inchcape Shipping Services, Panamá | (507) 279-4100 | 2/3/2010 |

| QTY | Product Description | Size | Unit Price | Total Price |
|---|---|---|---|---|
| 88 | Frozen Broccoli | LB | $2.95 | $259.60 |
| 88 | Frozen Cauliflower | LB | $2.42 | $212.96 |
| 10 | Frozen Cookies, Assorted | 240 UNITS | $98.40 | $984.00 |
| 420 | Frozen French Fries | LB | $1.31 | $550.20 |
| 88 | Frozen Green Beans | LB | $2.42 | $212.96 |
| 240 | Frozen Hash Brown Potato Patties | LB | $2.42 | $580.80 |
| 88 | Frozen Mixed Vegetables | LB | $2.42 | $212.96 |
| 15 | Frozen Bagels | 12 x 5 UNIT PACK | $32.76 | $491.40 |
| 60 | Frozen Pies, Assorted | EACH | $8.16 | $489.60 |
| 29 | Pizza, Cheese | 12 x 9.8 OZ | $45.06 | $1,306.74 |
| 144 | Frozen Mozzarella Sticks | LB | $5.70 | $820.80 |
| 30 | Frozen Waffles | 64.00 OZ | $18.82 | $564.60 |
| 50 | Seafood, Shrimp, Raw P/D | LB | $13.08 | $654.00 |
| 180 | Beef, Diced | LB | $4.51 | $811.80 |
| 250 | Beef, Patties (4 oz) | LB | $4.51 | $1,127.50 |
| 122 | Beef, Pot Roast | LB | $4.72 | $575.84 |
| 160 | Pork, Diced | LB | $6.36 | $1,017.60 |
| 122 | Pork, Loin, Boneless | LB | $6.36 | $775.92 |
| 240 | Chicken Breast Fillet, Breaded | LB | $5.54 | $1,329.60 |
| 300 | Chicken Breast Fillet, Plain | LB | $5.13 | $1,539.00 |
| 156 | Chicken Fingers, Breaded | LB | $5.95 | $928.20 |
| 222 | Chicken RTC, 9-Piece, Breaded | LB | $3.24 | $719.28 |
| 497 | Chicken RTC, Quarters | LB | $3.08 | $1,530.76 |
| 300 | Chicken Wings, Breaded | LB | $3.24 | $972.00 |
| 120 | Beef, Fajita Strip | LB | $5.13 | $615.60 |
| 500 | Beef, Ground | LB | $4.51 | $2,255.00 |
| 220 | Beef, Knuckle | LB | $4.72 | $1,038.40 |
| 120 | Fish, Fillet | LB | $5.33 | $639.60 |
| 110 | Fish, Salmon Steaks | LB | $11.44 | $1,258.40 |
| 255 | Pork, Chops | LB | $4.88 | $1,244.40 |

Inchcape Shipping Services, S.A.

Barco/Voy: McInerney
Llegada: 3 / 2 / 10
Aprobado:
Cód/Nom: PABLS 115364
Rec. No./Por: PC# 53067

IMP.PRODUCTOS TECNOGRAFICOS TEL.:221-9214  R.UC.9-93-647 D.V.93,  MARZO 2009 #2001 AL 3000

**Grand TOTAL:    $25,719.52**

**Exhibit A, page 1**

# Inchcape Shipping Servic~~RECEIVED~~elivery Ticket No. 2808

Ave. Ricardo J. Alfaro, Edison Tower, Piso 14
Central Telefónica: (507) 279-4100          3  FEB 2010

| Vessel Name | Contract Number | Terms | Date |
|---|---|---|---|
| USS McInerney | N00189-04-D-0001 | | 2/3/2010 |

| QTY | Product Description | Size | Unit Price | Total Price |
|---|---|---|---|---|
| 88 | Frozen Broccoli | LB | $3.60 | $316.80 |
| 88 | Frozen Cauliflower | LB | $2.95 | $259.60 |
| 10 | Frozen Cookies, Assorted | 240 UNITS | $120.00 | $1,200.00 |
| 420 | Frozen French Fries | LB | $1.60 | $672.00 |
| 88 | Frozen Green Beans | LB | $2.95 | $259.60 |
| 240 | Frozen Hash Brown Potato Patties | LB | $2.95 | $708.00 |
| 88 | Frozen Mixed Vegetables | LB | $2.95 | $259.60 |
| 15 | Frozen Bagels | 12 x 5 UNIT PACK | $39.95 | $599.25 |
| 60 | Frozen Pies, Assorted | EACH | $9.95 | $597.00 |
| 29 | Pizza, Cheese | 12 x 9.8 OZ | $54.95 | $1,593.55 |
| 144 | Frozen Mozzarella Sticks | LB | $6.95 | $1,000.80 |
| 30 | Frozen Waffles | 64.00 OZ | $22.95 | $688.50 |
| 50 | Seafood, Shrimp, Raw P/D | LB | $15.95 | $797.50 |
| 180 | Beef, Diced | LB | $5.50 | $990.00 |
| 250 | Beef, Patties (4 oz) | LB | $5.50 | $1,375.00 |
| 122 | Beef, Pot Roast | LB | $5.75 | $701.50 |
| 160 | Pork, Diced | LB | $7.75 | $1,240.00 |
| 122 | Pork, Loin, Boneless | LB | $7.75 | $945.50 |
| 240 | Chicken Breast Fillet, Breaded | LB | $6.75 | $1,620.00 |
| 300 | Chicken Breast Fillet, Plain | LB | $6.25 | $1,875.00 |
| 156 | Chicken Fingers, Breaded | LB | $7.25 | $1,131.00 |
| 222 | Chicken RTC, 9-Piece, Breaded | LB | $3.95 | $876.90 |
| 497 | Chicken RTC, Quarters | LB | $3.75 | $1,863.75 |
| 300 | Chicken Wings, Breaded | LB | $3.95 | $1,185.00 |
| 120 | Beef, Fajita Strip | LB | $6.25 | $750.00 |
| 500 | Beef, Ground | LB | $5.50 | $2,750.00 |
| 220 | Beef, Knuckle | LB | $5.75 | $1,265.00 |
| 120 | Fish, Fillet | LB | $6.50 | $780.00 |
| 110 | Fish, Salmon Steaks | LB | $13.95 | $1,534.50 |
| 255 | Pork, Chops | LB | $5.95 | $1,517.25 |

Grand TOTAL: $31,352.60

**Exhibit A, page 2**

Subject: FW: USS Bonhomm_ _hard Appt #USSFO15083
Date: Fri, 14 May 2010 14:17:58 +0100
From: Andrea.Ford@iss-shipping.com
To: andieford@hotmail.com

**From:** Andrea Ford
**Sent:** Monday, March 23, 2009 6:06 PM
**To:** Ian Whelan ISS-Mobile; Michael Mason ISS-Mobile; Noah Rudolph
**Cc:** Andrea Ford; ISS Government Services - Americas; Dave DeBoer; Larry Cosgriff; Leon Hall ISS-San Francisco; Tod Gannett ISS-Portland
**Subject:** FW: USS Bonhomme Richard Appt #USSFO15083

Good afternoon all,

We have reconciled the account for the USS Bonhomme Richard (San Francisco Fleet Week 2008) and found that we owe the vessel a refund of USD 14,376.37 (details below). I have attached the ISS invoices provided to the vessel at time of departure and the actual vendor invoices for the items/services that have changed. I will create a file in the appointment within POPDA with this information for future reference. Please let me know if you have any questions.

Note: I will be in San Diego for another meeting in mid-late April and would like to deliver the refund check to the vessel in person. Is it possible to have the check prepared and sent to me by 15 April?

Best regards,

Andrea

Andrea Ford
Manager, Government Services - Americas

Inchcape Shipping Services
(As Agents Only)
2129 General Booth Blvd, Suite 103-190
Virginia Beach, VA 23454
E-mail: andrea ford@iss-shipping.com
Group e-mail: opcen americas@iss-shipping.com

1

**Exhibit B, page 1**

Mobile: 703-896-6234
Fax: 757-426-6287

---

**From:** Angela Burrows
**Sent:** Monday, March 23, 2009 8:42 AM
**To:** Andrea Ford
**Subject:** USS Bonhomme Richard Appt #USSFO15083

Andie,

I have reconciled the USS Bonhomme Richard as requested, and my findings were as follows:

We billed a total of $188,636.07. Note that some of these charges were estimated. Eventually the actual vendor invoices came to $174,259.70. The difference of $14,376.37 is what we owe the Navy.

The vendor invoices with discrepancies involving estimates vs. actual were:

| | | | |
|---|---|---|---|
| Pilotage: | Billed $11850.00 | Actual $6980.52 | (PT - estimate vs. actual) |
| Potable Water: | Billed $1870.00 | Actual $1771.28 | (Fixed Price - estimated 200,000 gallons, actual was 157,080) |
| CHT Services: | Billed $38750.00 | Actual $34529.72 | (Fixed Price - estimated 200,000 gallons, actual was 177,788) |
| Vehicles: | Billed $4150.00 | Actual $3902.06 | (estimated $500 for refueling, actual was $247.94) |
| Landlines: | Billed $10100.00 | Actual $5160.05 | (estimated long distance at $5,000, actual was $60.05) |

Please let me know if you have any questions.

Thanks and regards,

Angela


Angela Burrows
Government Accounts Coordinator

Inchcape Shipping Services
(As Agents Only)
2129 General Booth Blvd.
Suite 103-190
Virginia Beach, VA 23454
E-mail: angela.burrows@iss-shipping.com
Group E-mail: opcen.americas@iss-shipping.com
Mobile: 757-806-1557
Fax: 757-426-6287


*(As Agents Only)*

*Inchcape Shipping Services – A World of Local Expertise*

This e-mail (including any attachments) may contain confidential, proprietary or privileged information. It may be read, copied and used only by the intended recipient. If you are not the intended recipient of this message you must not use, disseminate or copy it in any form or take any action in reliance on it. If you have received this e-mail in error, please notify the sender immediately by return e-mail. Please then delete the e-mail and any copies of it and do not disclose the contents to any person. We believe but do not warrant, that this e-mail and any attachments are virus free. You should take full responsibility for virus checking. Inchcape Shipping Services and its affiliated companies reserve the right to monitor all email communications through their internal and external networks

v1 0

---

**Exhibit B, page 2**

Subject: FW: USS Pinckney
Date: Fri, 14 May 2010 14:19:14 +0100
From: Andrea.Ford@iss-shipping.com
To: andieford@hotmail.com

**From:** Andrea Ford
**Sent:** Monday, March 23, 2009 9:56 PM
**To:** Ian Whelan ISS-Mobile; Michael Mason ISS-Mobile; Noah Rudolph
**Cc:** ISS Government Services - Americas; Andrea Ford; Dave DeBoer; Larry Cosgriff; Leon Hall ISS-San Francisco; Tod Gannett ISS-Portland
**Subject:** FW: USS Pinckney

Good morning all,

We have reconciled the account for the USS Pinckney (San Francisco Fleet Week 2008) and found that we owe the vessel a refund of USD $6,495.41 (details below). As you know, we often work off of averages in order to provide invoices prior to the vessels departure. The refund amount is based on the difference in averages versus actual. I have attached copies of the ISS invoices which we provided to the vessel at the time of departure as well as the actual vendor invoices for the items/services that have changed I will create a file in the appointment within POPDA with this information for future reference. Please let me know if you have any questions.

As I mentioned in my previous email, I will be in San Diego for another meeting in mid-late April and would like to deliver the refund check to the vessel in person. Is it possible to have the check prepared and sent to me by 15 April?

Best regards,

Andrea

Andrea Ford
Manager, Government Services - Americas

Inchcape Shipping Services
(As Agents Only)
2129 General Booth Blvd, Suite 103-190
Virginia Beach, VA 23454
E-mail: andrea.ford@iss-shipping.com
Group e-mail: opcen.americas@iss-shipping.com

1

**Exhibit B, page 3**

Mobile: 703-896-6234
Fax: 757-426-6287

---

**From:** Angela Burrows
**Sent:** Monday, March 23, 2009 1:26 PM
**To:** Andrea Ford
**Subject:** USS Pinckney

Andie,

I have reconciled the invoices for the USS Pinckney as requested. The difference in the ISS invoices and the vendor invoices (where we worked off of averages) is $6,495.41. The breakdown is as follows:

| | | | |
|---|---|---|---|
| Pilots | Billed $5900.00 | Actual $2261.91 | (PT – average vs. actual) |
| Potable Water | Billed $384.00 | Actual $286.02 | (Fixed Price – estimated 80,000 gallons, actual was 37,400 gallons) |
| CHT | Billed $11400.00 | Actual $10150.80 | (Fixed Price – estimated 60,000 gallons, actual was 46,140 gallons) |
| Phone lines | Billed $2828.00 | Actual $1447.90 | (estimated $1400 for long distance, actual was $19.90) |
| Vehicles | Billed $3175.00 | Actual $3044.96 | (estimated refueling at $400, actual was $269.96) |

I will scan and attached the invoices in a separate email.

Let me know if you have any questions

Angela Burrows
Government Accounts Coordinator

Inchcape Shipping Services
(As Agents Only)
2129 General Booth Blvd.
Suite 103-190
Virginia Beach, VA 23454
E-mail: angela.burrows@iss-shipping.com
Group E-mail: opcen.americas@iss-shipping.com
Mobile: 757-806-1557
Fax: 757-426-6287

**(As Agents Only)**

**_Inchcape Shipping Services – A World of Local Expertise_**

This e-mail (including any attachments) may contain confidential, proprietary or privileged information. It may be read, copied and used only by the intended recipient. If you are not the intended recipient of this message you must not use, disseminate or copy it in any form or take any action in reliance on it. If you have received this e-mail in error, please notify the sender immediately by return e-mail. Please then delete the e-mail and any copies of it and do not disclose the contents to any person. We believe but do not warrant, that this e-mail and any attachments are virus free  You should take full responsibility for virus checking. Inchcape Shipping Services and its affiliated companies reserve the right to monitor all email communications through their internal and external networks

v1 0

---

**Exhibit B, page 4**