UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ) | |
| NOAH RUDOLPH, ) | |
| ANDREA FORD, and ) | |
| LAWRENCE COSGRIFF, ) | |
| Plaintiffs, ) | |
| v. ) | |
| INCHCAPE SHIPPING SERVICES HOLDINGS LTD., ) | |
| ISS GROUP HOLDINGS, LTD., ) | |
| ISS MARINE SERVICES, INC., ) | Civil Action No. 10-1109 (RBW) |
| INCHCAPE SHIPPING SERVICES S.A., ) | |
| MILNE SERVICIOS MARITIMOS S.A. (d/b/a INCHCAPE SHIPPING SERVICES), ) | |
| INCHCAPE SHIPPING SERVICES DUBAI, LLC, and ) | |
| INCHCAPE SHIPPING SERVICES WORLD LIMITED, Unit 5-7 Lakeside Business Village, Fleming Road, Chafford Hundred Essex RM16 6YA, United Kingdom, ) | |
| Defendants. ) | |

## UNITED STATES' COMPLAINT IN INTERVENTION

On or about September 2, 2014, the United States of America ("United States" or "Government") notified the Court of its decision to intervene and proceed with this action. The United States, having intervened in this civil action and pursuant to 31 U.S.C. § 3730(b)(4)(A),

hereby files this Complaint as its Complaint in Intervention against Defendants Inchcape Shipping Services Holdings, Ltd. ("ISS Holdings"); ISS Group Holdings, Ltd. ("ISS Group Holdings"); ISS Marine Services, Inc. ("ISS Marine"); Inchcape Shipping Services, S.A. ("ISS Panama"); Milne Servicios Maritimos S.A. (d/b/a Inchcape Shipping Services) ("ISS Peru"); Inchcape Shipping Services Dubai, LLC ("ISS Dubai"); and Inchcape Shipping Services World Limited ("ISS World") (collectively, "Inchcape" or the "Inchcape Defendants"), which supersedes the previously filed complaints of  Relators Noah Rudolph, Andrea Ford, and Lawrence Cosgriff (collectively, "Relators") as to all allegations and claims under the False Claims Act.

The United States alleges as follows:

1.      The United States brings this action against Inchcape pursuant to the False Claims Act, 31 U.S.C. §§ 3729 to 3733, (the "FCA") and under common law theories of liability, seeking damages, treble damages, and civil penalties as provided by law.

2.      Through its Contracts with the U.S. Navy (defined below), Inchcape agreed to provide essential support services to our nation's soldiers and sailors.  In particular, the Contracts called for Inchcape to provide services incident to port calls, or "husbanding services," to U.S. Government vessels at more than 213 ports around the world.   As a husbanding services provider, Inchcape was required to tend to specified needs by its client vessels, such as arranging for services provided by host nation authorities; collecting, removing, and disposing of sewage; arranging for the provision of goods and services by local vendors; arranging for force protection services; and arranging for crewmember transportation and excursions.  The services required by the Contracts often were necessary as members of the United States armed forces departed to and returned from the battlefield.

3.     In its Contracts, Inchcape agreed (i) to provide certain specific goods and services at fixed prices and under terms and conditions that dictated how Inchcape was to calculate its billing quantities; (ii) to provide general husbanding services in return for a husbanding fee, including arranging and facilitating the provision of services and goods not specified in the Contracts from local vendors, and to credit the Navy for any rebates, discounts, or credits Inchcape received from local vendors; (iii) to bill services performed by port authorities at cost; (iv) to reconcile promptly its estimated billings with the actual quantities it provided Navy vessels; (v) not to use vendors in which Inchcape held a financial interest without notice to and consent of Navy officials; (v) to provide goods and services to U.S. Navy vessels at fair and reasonable prices; and (vi) to maintain auditable records of the goods and services it provided to allow the United States to later review and ensure Inchcape's billings were consistent with its vendors and the terms of the Contracts.

4.     In the course of performing under the Contracts, Inchcape submitted thousands of false invoices that overcharged the U.S. Navy for its services, allowing Inchcape to profit substantially and improperly from its Contracts.

5.     As detailed below, Inchcape's false invoices took many forms.  For example, Inchcape: (i) overstated quantities of specifically priced items, (ii) marked-up other items by more than 900%; (iii)  billed for ancillary services that the Contracts required to be provided at no additional charge; and (iv) mischaracterized the services it rendered in order to charge the Navy in excess of the prices permitted by the Contracts.  In addition, Inchcape improperly retained millions of dollars it owed the Navy in reconciliation payments, and it failed to satisfy its obligations to maintain records of vendor invoices, thus inhibiting the United States' discovery of the full extent of Inchcape's fraud.

6.     Inchcape submitted its inflated billings to the government with knowledge of their falsity.  Indeed, high-ranking Inchcape officials (including its then-Chief Executive Officer ("CEO") and officer in charge of its Middle East operations) knowingly disregarded the plain text of the Contracts even after an internal audit revealed substantial sums owing to the Navy and the United States informed Inchcape its conduct was wrongful.

7.     As a result of Inchcape's submission of false claims, the United States paid Inchcape tens of millions of dollars more than the Government owed Inchcape.

## JURISDICTION, VENUE, AND PARTIES

8.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345, as this action concerns a federal question and is brought by the United States, and pursuant to 31 U.S.C. §§ 3729 and 3730(a), as the Government asserts claims arising under the FCA.

9.     This Court has personal jurisdiction over the Defendants because, among other things, they regularly transacted business with the United States.

10.     Venue is proper in this District under 31 U.S.C. § 3732(a), because Inchcape transacted business in the District of Columbia and because Inchcape committed acts proscribed by the FCA in this District.  Inchcape's officers and employees located in the United States, including Relators, had responsibility for and authority over Inchcape's Government Services operations outside the United States.  They monitored Inchcape's compliance failures and reported them to senior management from the United States, and discussed Inchcape's submission of false claims with senior Inchcape management at meetings held in and around this District.

11.     Plaintiff, the United States of America, through the U.S. Navy, procures services related to the husbanding of U.S. military vessels in ports around the globe to support its wartime operations and peacekeeping missions.

12.     Relator Noah Rudolph is a resident of Virginia and worked for ISS Marine as the Chief Operating Officer for Inchcape's Government Services Division from October 2008 to July 2009.

13.     Relator Andrea Ford resides in England, is a permanent resident of the United Kingdom, and worked for ISS Marine from August 2007 to September 2010.  Ford served as Inchcape's Assistant Manager of Government Services in North and Central America from December 2007 to February 2008, and as Inchcape's Government Services Manager of North and Central America from March 2008 to September 2010.

14.     Relator Lawrence Cosgriff is a resident of Virginia and worked for ISS Marine from April 2007 until his resignation in December 2009, which became effective in June 2010. Cosgriff served as Inchcape's Senior Vice-President of Government Services from April 2007 to February 2009, was the *de facto* head of Inchcape's Government Services for the Western Hemisphere from September 2007 to March 2008, and the world-wide head of Inchcape Government Services beginning in March 2008.  Cosgriff was promoted in February 2009 to be Inchcape's Executive Vice-President of Government Services.  While at Inchcape, Cosgriff was directly supervised by the Inchcape group CEO, Claus Hyldager.

15.     The Inchcape group of companies includes the Inchcape Defendants and is one of the world's leading marine services providers, managing tens of thousands of port calls for clients each year in hundreds of ports around the world.  One of the companies' principal lines of business is providing ship husbanding or agency services, where Inchcape provides various

services for client vessels, such as facilitating the purchase of items from local vendors at each port.

16.     Defendant Inchcape Shipping Services Holdings Limited (or "ISS Holdings") is a corporation formed under the laws of the United Kingdom and is the entity that manages and directs the activities of the Inchcape group of companies, including an extensive network of offices owned and operated in the continental United States as well as Hawaii, Puerto Rico, and St. Croix in the U.S. Virgin Islands.  During the period relevant to this complaint, ISS Holdings conducted its operations through officers and employees, including but not limited to, former Chief Executive Officer, Claus Hyldager ("Hyldager"), and former Regional Director for Government Services in Southwest Asia, Akbar Khan ("Khan").  Also, by virtue of a contract modification dated October 27, 2005, and signed by Khan on behalf of ISS Dubai and ISS Holdings, ISS Holdings was the Inchcape party to the SWA Contract (defined below).  At all times relevant to this Complaint, ISS Holdings dominated and controlled its wholly-owned direct and indirect subsidiaries and directed and approved the efforts taken by those subsidiaries and its joint ventures where Inchcape was its operating partner.

17.     Defendant ISS Group Holdings, Ltd. (or "ISS Group Holdings") is a corporation formed under the laws of the United Kingdom and a direct, wholly-owned subsidiary of ISS Holdings.  In the Inchcape group of companies, ISS Group Holdings operates as an investment holding company, a procurer of management and operational services, and serves as the entity that holds ISS Holdings' ownership interests in its locally incorporated operating subsidiaries and joint ventures.  During the period relevant to this dispute, ISS Group Holdings conducted its operations through employee-directors, including but not limited to, Hyldager.  At all times relevant to this Complaint, ISS Group Holdings dominated and controlled its wholly-owned

direct and indirect subsidiaries and directed and approved the efforts taken by those subsidiaries and its joint ventures where Inchcape was its operating partner.

18.     Defendant ISS Marine Services, Inc. (or "ISS Marine") is a corporation formed under the laws of the State of California with its principal place of business in the State of Alabama.  ISS Marine is a direct, wholly-owned subsidiary of ISS Group Holdings and an indirect subsidiary of ISS Holdings.  During the period relevant to this dispute, ISS Marine (at the direction and control of ISS Holdings and ISS Group Holdings) operated Inchcape's business in North America and portions of Central America and the Caribbean and contracted with the U.S. Navy to provide ship husbanding and other port services and goods to the U.S. Navy, U.S. Coast Guard, and other Government-owned ships.  ISS Marine was the Inchcape party to the West CONUS Contract (defined *infra* ¶ 41).

19.     Defendant Inchcape Shipping Services S.A. (or "ISS Panama") is a corporation (under local law, referred to as a Sociedad Anónima) formed under the laws of the Republic of Panama.  ISS Panama is a direct, wholly-owned subsidiary of ISS Group Holdings and an indirect subsidiary of ISS Holdings.  During the period relevant to this dispute, ISS Panama (at the direction and control of ISS Holdings and ISS Group Holdings) operated Inchcape's business in Panama, Central America, the South Caribbean, and portions of South America and contracted with the U.S. Navy to provide ship husbanding and other port services and goods to the U.S. Navy, U.S. Coast Guard, and other Government-owned ships.  ISS Panama was the Inchcape party to the Peru Contract, the Panama Contract, and the Mexico Contract (defined *infra* ¶¶ 37, 38, and 40, respectively).

20.     Defendant Milne Servicios Maritimos S.A. (d/b/a Inchcape Shipping Services) (or "ISS Peru") is joint stock company organized under the laws of the Republic of Peru.  ISS Peru

is a wholly-owned direct or indirect subsidiary of ISS Holdings and ISS Group Holdings and conducts certain of Inchcape's operations in Peru.  Relevant to this action, officials and employees of ISS Peru provided services to the U.S. Navy under the Peru Contract (defined *infra* ¶ 37) and facilitated and participated in the false billing schemes perpetrated on the United States by Inchcape under that Contract.

21.     Defendant Inchcape Shipping Services Dubai, LLC (or "ISS Dubai") is a limited liability company organized under the laws of Dubai, United Arab Emirates ("UAE").  ISS Holdings, through subsidiaries under its direction and control (including through Inchcape Shipping Services Dubai Limited, a corporation organized under the laws of the Bailiwick of Jersey that is a wholly-owned subsidiary of ISS Group Holdings), owns a supermajority interest in ISS Dubai.  ISS Dubai conducts certain of Inchcape's operations in Dubai, other UAE Emirates, and Africa.  ISS Dubai was the original Inchcape party to the SWA Contract (defined *infra* ¶ 42), and after ISS Holdings replaced ISS Dubai as contracting party in October 2005 (defined *infra* ¶ 43), ISS Dubai continued to provide services to the U.S. Navy under the SWA contract. ISS Dubai is also the Inchcape party to the AFRICOM Contract (defined *infra* ¶ 39).

22.     Defendant Inchcape Shipping Services World Limited (or "ISS World") is a corporation organized under the laws of the Cayman Islands with its principal place of business in the United Kingdom.  ISS World is the ultimate parent holding company of the Inchcape group of companies and wholly owns ISS Holdings.  During the period relevant to this dispute, ISS Holdings conducted its operations through employee-directors, including but not limited to, Hyldager.

23.     Third-party Claus Hyldager is the former CEO of the Inchcape group of companies and served as an officer, employee, director, or agent of ISS Holdings, ISS Group

Holdings, and ISS World during his time at Inchcape. In his role with Inchcape, Hyldager traveled to the United States, including this District, to conduct business on behalf of the Inchcape group of companies including under the Contracts (defined *infra* ¶¶ 37-43).

## STATUTORY FRAMEWORK

24.     Originally enacted in 1863 to combat fraud against the Union Army during the Civil War, the FCA is the primary tool with which the United States combats false claims and fraud against the Government and protects the public fisc.

25.     The FCA provides for the award of treble damages and civil penalties for, among other acts, (i) knowingly submitting, or causing the submission of, false or fraudulent claims for payment to the United States Government, (ii) knowingly using a false record or making a false statement material to a claim, and (iii) knowingly concealing or improperly avoiding or decreasing obligations to pay money to the Government.

26.     The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), provides, in part, that anyone who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or

> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted [for inflation] . . ., plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A)-(B), (G).

27.     For purposes of the FCA, "the terms 'knowing' and 'knowingly' -- (A) mean that a person, with respect to information -- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud[.]" 31 U.S.C. § 3729(b)(1).

28.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 per violation (*i.e.,* for each false claim, false record, or false statement) for violations occurring on or after September 29, 1999.

29.     The FERA amendments to the FCA made the amended false statement provision (31 U.S.C. § 3729(a)(1)(B)) retroactive and applicable to all alleged violations of the false statements provision in this action.  FERA's other amendments were effective as of the date of enactment, May 20, 2009.  For the sake of clarity, the Government cites only to the current version of the statute, unless otherwise noted.  All references to the FCA should be understood to refer to the version of the FCA applicable under the particular circumstances.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

30.     Pursuant to each of its contracts with the U.S. Navy, Inchcape agreed to bill the U.S. Navy at fixed prices for certain specified supplies and services.  These fixed-price items were identified in the contacts by unique contract line item numbers, commonly referred to as "CLIN Items" or "CLINs".

31.     In addition, Inchcape agreed to arrange for ships to receive certain goods and services provided by the local port authorities at rates established by those authorities.  These items are commonly referred to as "Port Tariff Items."

32.     Inchcape further agreed to provide specified "husbanding services," including facilitating the Navy's purchase from local vendors of supplies and services not identified in the contract or provided by local port authorities ("Non-CLIN Items" or "Non-CLINs").  Pursuant to the contract, Inchcape's exclusive compensation for husbanding services was an agreed-upon daily husbanding fee.

33.     For some services that were difficult to quantify prior to a ship's departure from port, Inchcape was permitted to bill the Navy an estimated amount, but the contracts required Inchcape to reconcile its estimates against actual amounts, and to credit the Navy promptly for the amount of any overpayments.

34.     Inchcape also agreed to maintain sufficient records to allow the Navy to audit Inchcape's charges under the Contracts.

35.     Inchcape failed to abide by its agreements and instead submitted false invoices that overcharged the U.S. Navy for the services Inchcape provided.  Specifically, Inchcape (i) misstated quantities of the goods or services provided; (ii) misstated prices by including mark-ups on Port Tariff Items; (iii) misstated prices by including mark-ups on Non-CLIN Items; (iv) improperly included separate billings for services and supplies incidental to providing CLIN Items; (v) falsely billed CLIN Items as Non-CLIN Items; and (vi) improperly included services performed by sham entities or entities with whom Inchcape had a financial interest without prior approvals.

36.     Inchcape undertook this misconduct knowingly.  Inchcape's senior management was intimately familiar with Inchcape's billings and the ways in which those billings violated the Contracts.

I.      **INCHCAPE CONTRACTED WITH THE U.S. NAVY TO PROVIDE HUSBANDING AND RELATED SERVICES IN CERTAIN REGIONS AROUND THE WORLD.**

37.      In or about February 2003, the U.S. Navy accepted the offer of and awarded ISS Panama a contract through the Navy's Fleet and Industrial Supply Center ("FISC") located in Norfolk, Virginia, for the provision of husbanding services and supplies in ports located in the Republic of Peru, Contract No. N00189-03-D-0015 (the "Peru Contract").   The initial Peru Contract called for a base year and four option years.

38.      In or about December 2003, the U.S. Navy accepted the offer of and awarded ISS Panama a contract through the Navy's FISC located in Norfolk, Virginia, for the provision of husbanding services and supplies in ports located in the Republic of Panama, Contract No. N00189-04-D-0001 (the "Panama Contract").   The initial Panama Contract called for a base year and two option years, but was extended through modifications and ultimately terminated in August 2010.

39.      In or about July 2004, the U.S. Navy accepted the offer of and awarded ISS Dubai a contract through the Navy's Naval Regional Contract Center ("NRCC," later known as FISC Sigonella Detachment Naples) located in Naples, Italy, for the provision of husbanding services and supplies in ports and other locations in West Africa, South Africa, South-East Africa, and African inland countries, Contract No. N68171-04-D-4034 (the "AFRICOM Contract").   The initial AFRICOM Contract called for a base year and four option years, but was extended through modifications and ultimately terminated in March 2012.

40.      In or about October 2004, the U.S. Navy accepted the offer of and awarded ISS Panama a contract through the Navy's FISC located in San Diego, California, for the provision of husbanding services and supplies in ports located in the United Mexican States, Contract No. N00244-05-D-0006 (the "Mexico Contract").   The initial Mexico Contract called for a base year

and three option years, but was extended through modifications and ultimately terminated in December 2010.

41.     In or about November 2004, the U.S. Navy accepted the offer of and awarded ISS Marine a contract through the Navy's FISC located in San Diego, California, for the provision of husbanding services and supplies in ports located in the Western portion of Continental United States, Contract No. N00244-05-D-0014 (the "West CONUS Contract").   The initial West CONUS Contract called for a base year and two option years, but was extended through modifications and ultimately terminated in October 2010.

42.     In or about June 2005, the U.S. Navy accepted the offer of and awarded ISS Duabi a contract through the Navy's FISC Sigonella Detachment Bahrain for the provision of husbanding services and supplies in ports located in Southwest Asia, Contract No. N49400-05-D-A008 (the "SWA Contract").   The initial SWA Contract called for a base year and four option years, but was extended through modifications and ultimately terminated in May 2014.

43.     By modification number P00004 effective October 27, 2005, and executed by Khan for Inchcape and Richard C. Bauer ("Bauer") for the U.S. Navy (the then relevant Contracting Officer), the Inchcape contracting party to the SWA Contract changed from ISS Dubai to ISS Holdings.

44.     Generally, under each of the contracts between Inchcape and the U.S. Navy identified in Paragraphs 37 to 43 above (the "Contracts"), Inchcape agreed to provide certain husbanding and related services to the U.S. Navy.

45.     The Contracts were negotiated and administered by Navy officials assigned to the Naval Supply Systems Command ("NAVSUP") working in the relevant FISC.   Primary responsibility for each contract was assigned to a Contracting Officer within the relevant FISC.

46.     The designated Naval Supply Officer assigned to each ship had the responsibility and authority to place orders under the Contracts.  As a ship prepared for a port visit, the ship's Supply Officer provided the ship's requirements to Inchcape.  Inchcape was required to provide the requested supplies and services at the Supply Officer's direction during the duration of the port call.  While the designated Supply Officer was authorized to make changes to the ship's order during the call, he or she was not authorized to change the terms of conditions of the Contract under which the order was placed.  At the end of a call, Inchcape invoiced the ship for the supplies and services it purportedly provided and the ship paid those invoices.

### A.     Inchcape's Contracts Required It to Bill the Navy for CLIN Items at the Rates Negotiated in the Contract, Which Were Inclusive of Incidentals.

47.     Each Contract listed the CLIN Items the Navy anticipated ordering under the Contract and the base unit of measure for each CLIN Item.  In submitting its bid for each Contract, Inchcape proposed a fixed price for each CLIN Item, typically on a chart or spreadsheet that also reflected the CLIN number, a brief description of the CLIN, the applicable unit of measure, an estimate of the quantity the Navy may require for each CLIN, and any additional specifications for the CLIN.  In each case, the Navy accepted Inchcape's proposed prices and they were incorporated into the respective Contract.

48.     For example, under the SWA Contract, Inchcape proposed to offer at all UAE ports a "sedan with driver" (CLIN X111AC) at a price of $157.00 per day for the first (base) year and subsequent option years.  The Navy estimated it required 200 days of this service. Additionally, the Navy specified in a header in the pricing chart for all "Transportation Services" CLINs at UAE ports (CLINs beginning X111) that "[a]ll vehicles include drivers and fuel (not to be billed separately) for all ports in UAE."

49.     Each Contract provided further details and specifications regarding the Contract's CLIN Items.

50.     For example, the SWA Contract specified for CLINs beginning with "X043" for "Red Carpet Runners" that the "Red Carpet runner is three (3) feet wide x ten (10) feet long."

51.     Each Contract also specified generally applicable terms relating to CLIN Items. In particular, the Contracts stated that unit prices for each CLIN Item included services incident to supplying the CLIN Item unless otherwise stated.  Specifically,

a.      The Peru Contract provided: "Unit prices for all contract items described below shall be inclusive of all necessary equipment, licensed operators, all liability insurance as required by local law, holiday and overtime costs, customs clearances, fuel and operating expenses, and any applicable taxes per international agreement."

b.      The Panama, Mexico, and West CONUS Contracts provided: "Unit prices for all contract items described below shall be **inclusive** of all necessary equipment, licensed operators, all liability insurance as required by local law, holiday and overtime costs, customs clearances, fuel and operating expenses, and any applicable taxes." (emphasis in original).

c.      The AFRICOM Contract provided: "[U]nit prices for all contract items described below shall be inclusive of all necessary equipment, licensed operators, all liability insurance as required by local law, holiday and overtime costs, customs clearances, fuel and operating expenses," and repeated that "[CLIN] prices shall also include performance at night, in overtime, Saturdays, Sundays, and Holidays; and service performed under heavy rain, or service to tankers and ships carrying explosives. They also include all operating expenses including tugs, barges, trucks, personnel, and customs clearances."

d.      The SWA Contract provided: "Unless otherwise provided, [CLIN] prices shall also include performance at night, on overtime, weekends, and all holidays; and service performed under heavy weather, or service to tankers and ships carrying explosives. They also include all operating expenses including tugs, barges, trucks, personnel, and customs clearances," and repeated:

> All prices contained in [the CLIN pricing charts] reflect total compensation for the services detailed therein and are fully inclusive of all costs including labor (workers, management, aids, assistants, operators), overhead, general and administrative (G&A) expenses, and profit.  Overhead and G&A expenses include, but are not limited to: expenses for telephone, telefax, e-mail and postage, clerical support and administrative support; and unless otherwise noted in this section include: transportation of equipment, incidental charges for the use of cranes & forklifts for placement of equipment on/off ships, overtime and holiday charges, fuel, insurance, demurrage and stand-by charges. Several items are based on a time measurement (i.e., hourly or daily rates); for equipment and services provided by the Port Authority, time measurements will be in accordance with the published Port Tariff Schedule. Time periods shown in the "Pricing Schedule" are exclusive of mobilization and demobilization (mob & demob) time; the Government will only pay mob & demob charges if specifically contained in the "Pricing Schedule". Unless separately priced, rates offered are inclusive of mobilization and demobilization.

52.     The Contracts also provided certain information regarding conversions between local measuring units and commonly used US-units for Inchcape to use in billing the Navy.

53.     For example, the SWA Contract provided definitions for the units to be used in billings under that contract.  These definitions included that a "cubic meter = 264.2 gallons" (reflecting a conversion using U.S. gallons, not Imperial gallons) and "gallon = 3.7854 liters" (again reflecting a conversion using U.S. gallons).

**B.      Inchcape's Contracts Required It to Bill the Navy for Port Tariff Items At Actual Cost.**

54.     Each of the Contracts also denoted items that were to be provided by port authorities at the ports covered by the respective Contracts (*i.e*, Port Tariff Items).

55.     Each Contract expressly instructed that each and every Port Tariff Item was to be billed by Inchcape to the U.S. Navy at the same rate the port authorities charged Inchcape. Specifically,

a.     The Peru, Panama, Mexico, and West CONUS Contracts provided: "The Contractor shall not charge prices for any services in excess of Port Tariff Rates[.]"

b.     The AFRICOM Contract provided: "Invoices for services or supplies provided under Port Tariffs shall be prepared as directed by the authority establishing the Tariff," and "Port Tariffs will apply to those services which are based on the port tariff rates established and controlled by the Port Authorities."

c.     The SWA Contract provided: "Port tariffs will apply to those services that are based on the port tariff rates established and controlled by the Port Authorities," "Port tariff items are in accordance with current port tariff rates," and "For items identified as Port Tariff Items by the Offeror, the current port tariff price applies."

**C.     Inchcape's Exclusive Compensation for Arranging Purchases of Non-CLIN Items Was Its Husbanding Fee, and the Contracts Prohibited Inchcape From Profiting From the Sale of Non-CLIN Items at the Navy's Expense.**

56.     Under each of the Contracts, Inchcape agreed to accept a husbanding fee in return for providing husbanding services.

57.     Each Contract further specified that Inchcape's husbanding services included arranging for the Navy to purchase Non-CLIN Items from third-party vendors.

58.     Each Contract also made clear that Inchcape's husbanding fee was the sole remuneration for arranging the provision of Non-CLIN Items and that Inchcape was not to otherwise mark-up such items when charging them to the Navy.

59.     Each Contract also made clear that Inchcape obligated itself to find reliable local sources for Non-CLIN Items.

60.     Specifically, the Peru, Panama, Mexico, and West CONUS Contracts provided that "the Husbanding Fees . . . constitute total consideration for performance of Husbanding Services," and described Husbanding Services, in part, as follows:

> When requirements exist for [Non-CLIN Items]. . . the Contractor shall assist the Supply Officer of the vessel in purchasing requirements from reliable sources. The Contractor is responsible for meeting the highest standards of care and business judgment when assisting with purchases of ship requirements[.] The Contractor is responsible to procure, manage, and ensure timely delivery or performance of all supplies or services ordered under this contract, or procured by a ship or Contracting Officer with the Contractor's assistance.

61.     The AFRICOM and SWA Contracts stated, "[t]he [Husbanding] Fees represent total compensation for the contractor except for supplies and services with Fixed Prices [*i.e.*, CLIN Items]. Any other compensation in the form of rebates, discounts, etc. shall be credited to the U.S. Navy."  These contracts further provided a CLIN for Husbanding Services that included "Arranging [Non-CLIN] Supplies and Services." This provision required Inchcape to (i) "obtain[] information from, and deliver[] information to, reliable sources" for Non-CLIN Items, including pricing information; (ii) deliver to vendors Navy orders for Non-CLIN supplies and services; and (iii) "facilitate receipt of the [Non-CLIN] items by the ship."

62.     Moreover, the SWA Contract stated that "[t]he operational needs of ships and exercises require the Husbanding Contractor to frequently assist the Ordering Officer in contracting for certain items not priced in the contract."

63.     The AFRICOM and SWA Contracts also required Inchcape to submit written internal policies and procedures on arranging Non-CLIN Items "to include purchasing procedures" for approval by the Navy within 60 days of their respective contract awards.

64.     The Contracts also expressly stated that all orders were subject to the terms and conditions of the respective contract and that "[i]n the event of conflict between a delivery order or task order and contract, the contract shall control."

**D.**     **The SWA Contract Required Inchcape to Reconcile it Billings and Remit Promptly Any Excess Payments It Received From the Navy.**

65.     For certain services that were difficult to quantify prior to a ship's departure from port, the SWA Contract permitted Inchcape to bill Navy vessels based on estimated quantities. The Contract required Inchcape to reconcile its estimates against the actual services delivered and, if the Navy had overpaid Inchcape, to return the overpayment to the Navy within 30 days.

66.     Specifically, the SWA Contract provided: "In those cases when an estimated bill is provided to the ship, the Contractor shall reconcile the estimated amounts paid by the ship against the actual bill, and shall credit or debit the ship within 30 days of receipt of the actual bill."

**E.**     **Inchcape's Contracts Required It to Report, and Obtain Navy Clearance to Use Vendors in Which Inchcape Held a Financial Interest.**

67.     The Contracts also contained conflict of interest provisions, which required Inchcape to alert the Navy when it proposed to use an affiliated vendor for the provision of Non-CLIN Items.

68.     For example, the Peru, Panama, Mexico, and West CONUS Contracts provided that "[t]he Contractor shall disclose to the Supply Officer of any ship for which the Contractor is providing services of any financial or beneficial interest the Contractor has or may have in any vendor whose supplies or services that are not otherwise covered under this contract are being proffered to the Supply Officer."

**F.**     **Inchcape's Contracts Required It to Retain Auditable Records to Substantiate Its Billings.**

69.     Each of the Contracts required Inchcape to retain all records related to its billings for a period of three years after the termination of each respective Contract to allow the United States to examine or audit Inchcape's billings.

70.     Specifically, each Contract incorporated that portion of Federal Acquisition Regulation ("FAR") 52.215-5 relating to the retention of records.

71.     The SWA Contract also required Inchcape to obtain written disposal certificates from the appropriate local disposal authority for the disposal of waste removed under the SWA Contract's CHT provisions (defined below).

## II.   INCHCAPE KNOWINGLY SUBMITTED INVOICES TO THE U.S. NAVY THAT WERE MATERIALLY FALSE AND FAILED TO COMPLY WITH THE TERMS OF ITS CONTRACTS.

72.     Inchcape repeatedly and knowingly submitted materially false invoices that violated the contractual provisions detailed above, causing damages to the United States and improperly enriching Inchcape at the expense of the U.S. Navy.

73.     Indeed, Inchcape executives (including Hyldager and Khan) and other employees understood the terms of the Contracts and knew Inchcape's billings were inappropriate and false.

74.     The plain, unambiguous language of the Contracts informed Inchcape of its obligations to bill accurate quantities, not to invoice separately for services included in a CLIN, not to mark-up Non-CLIN and Port Tariff Items, to retain required documents, to avoid undisclosed conflicts of interest, and to reconcile and remit promptly all amounts owed to the Navy.  There is no reasonable reading of the Contracts to the contrary.

75.     Moreover, Inchcape's executives engaged in numerous conversations demonstrating their knowledge that Inchcape was routinely overbilling the Government.  For example, during a three-day service workshop course in Dubai for approximately thirty ISS Middle East employees in December 2007, high-level Inchcape employees, including Khan, repeatedly spoke openly in front of Ford and Inchcape's Government Services Manager Dan Young about the unlawful practices employed by Inchcape to inflate its Navy invoices.

76.     Ford and Young reported their concerns with these practices to Cosgriff, who, in turn, reported them to Hyldager.  Cosgriff then also urged Hyldager to take prompt action to investigate, eliminate, and rectify Inchcape's inappropriate billings.  Hyldager failed to do so.

77.     Time and again throughout 2008 and 2009, Cosgriff and his team raised with Hyldager and other senior Inchcape executives concerns about Inchcape's improper billing practices and urged Inchcape (unsuccessfully) to take appropriate action to investigate and end those practices.  For example:

a.      During a port call made by the USS Theodore Roosevelt under the AFRICOM Contract, Ford observed Khan instructing Inchcape employees to overcharge the Navy in various ways.  After the call, Cosgriff and his team questioned those overcharges and sought the port call records to review the call.  Khan initially refused to provide documents necessary to analyze the charges on the call and then would only provide Cosgriff the materials in-person, writing "The whole idea to give this to [Inchcape's CFO] to hand over to you in London was to avoid email." Thereafter, Cosgriff and his team analyzed the call, discovering substantial amounts of improper charges, and reported the findings to Hyldager and other senior management.  Hyldager and management refused to take any actions.

b.      In late-2008 and early-2009, Cosgriff and his team similarly discovered false billings on Navy port calls made under the West CONUS, Mexico, Panama, and Peru Contracts and similarly raised concerns regarding those billings with Inchcape executives responsible for those regions.  Once again, Inchcape failed to remedy its falsities, inform the Navy about them, take action to return to the Navy the amount of its overbilling, or discontinue its improper billing practices.  Instead, Inchcape officials ignored the concerns of Cosgriff's team and terminated their access to certain billing information.

c.      At an April 2009 meeting between Cosgriff, Rudolph, and Hyldager in Tysons Corner, Virginia, Cosgriff and Rudolph reported the false billings by Inchcape they uncovered in other ports around the world and informed that Inchcape officials were limiting their access to information as a result of their efforts.  They strongly urged Hyldager once again to take prompt and decisive action, suggesting that Inchcape inform the Navy of Inchcape's frequent overcharging, commission outside counsel to conduct a comprehensive internal review of the amounts due, and refund to the Navy the amount of all overpayments.  Cosgriff and Rudolph stressed that Inchcape had no other appropriate options.  Hyldager took no action and excluded Cosgriff and Rudolph from meetings regarding Inchcape's false billings.

78.      On at least one occasion, Hyldager explained that he was reluctant to investigate and return any ill-gotten gains because the amounts might be significant and returning the overpayments to the Navy could jeopardize Inchcape's financial condition.

### A.      Inchcape Charged the Navy Improper Markups on Port Tariff Items.

79.      Notwithstanding the clear language of the Contracts that required Inchcape to bill the Navy Port Tariff Items at actual cost, Inchcape knowingly and routinely charged the U.S. Navy improper markups on Port Tariff Items under the Contracts.

80.      For example, the Mexico Contract provided that CLIN 011AA for Pilots and CLIN 011AB for Pilot Boats were Port Tariff Items for the Port of Mazatlan.  Nonetheless, on a port call made by the USS Champion to that port in May 2009, Inchcape billed the Navy sums in excess of those charged by the relevant port authority.  Specifically, Inchcape billed the Navy for two movements totaling $2,500, when the port authority charged Inchcape only $409.69 for those services.  Inchcape recorded a profit of $2,090.31 on these services alone, which represented more than a 510% markup.

81. Inchcape clearly knew it was profiting improperly from port tariff items. A tab in the same spreadsheet it used to generate its invoices to the Navy noted the vendor invoiced amounts and the profits Inchcape realized on each line item of its Navy billings. Notably, Inchcape's ill-gotten profit on these Port Tariff Items constituted nearly 50% of its total net profit for the entire port call.

82. Inchcape marked-up Port Tariff Items on many other occasions, including the following:

a. In May 2009, Inchcape billed the Navy under its Panama Contract for $7,315.00 in Panama Canal tolls for the USS Warrior. Panama Canal tolls were Port Tariff Items under the Panama Contract. During the same month, Inchcape also billed the Navy the identical amount of $7,315.00 for Panama Canal tolls for the USS Chief. The relevant Panama Canal authority (*i.e.*, the Autoridad del Canal de Panama), however, charged Inchcape only $3,398.34 for tolls for each ship. As such, Inchcape overcharged the Navy by $3,916.66 for tolls for each ship, which represented more than a 115% markup on this Port Tariff Item.

b. In October 2011, the USS George W. Bush made a port visit to Jebel Ali in Dubai. As part of that port visit, Inchcape provided tugs to position painting barges (which barges Inchcape it incorrectly billed as a Non-CLIN Item). Although port dues for painting barges should not have been billed at all because they were incidental expenses to providing a CLIN Item, if such dues were separately compensable they would have been covered by CLINs X130AF and X130AG, which were designated as Port Tariff Items by the SWA Contract. Indeed, port dues for these tugs were charged by DP World, the port authority for Jebel Ali. Instead of not charging for these services or charging the applicable port tariff rate, Inchcape

marked up its billing and charged the Navy $13,070.14 more than the port dues charged by the port authority.

c.        In March 2009, the USS Chief made a port visit to Cozumel, Mexico.  As part of that port visit, Inchcape provided Pilots and Pilot Boats under CLINs 011AA and 011AB, which were Port Tariff Items.  Instead of charging these items at cost, Inchcape marked-up these items and charged the Navy in total $2,460.73 more than what the port authority charged Inchcape for these services.

**B.        Inchcape Billed the Navy for Supplies and Services Using False Quantities and Measurements and Rates that Exceeded Contract Prices.**

83.        Inchcape also knowingly billed inflated quantities of the supplies and services it purportedly provided to the Navy and billed at rates that exceeded the agreed upon rates for CLIN Items set forth in the Contracts.

84.        For example, Inchcape overstated the quantity of portable toilets it provided during a port call by the USS Nimitz at Jebel Ali in Dubai from late-May to early-June 2007.  As part of that visit, Inchcape provided the Navy certain portable toilet units as CLIN Items under the SWA Contract -- CLIN X138AB Portable Toilet Unit, 4-Commode Unit.  The SWA Contract provides that the unit billed under this CLIN "shall have a minimum of 4 commodes, 4 urinals and four sinks. The daily rate shall include pumping as many times as necessary to ensure sanitary conditions, providing all chemicals, cleaning products and toilet paper.  Toilet facilities shall be checked by the Contractor at least twice daily at least six hours apart to ensure cleanliness."

85.        Inchcape billed the Navy for five four-commode units for seven days, or 35 unit/days, for a total charge of $13,650.00 (Invoice No. DX ANPI 33626).

86. Inchcape's invoice to the U.S. Navy for these portable toilets was false. The vendor invoice corresponding to Inchcape's provision of portable toilet units for this port call reflects that only three four-commode units were provided and they were provided for only five days, for a total of 15 unit/days.

87. Inchcape's internal port call accounting system called DREAM reflects no other vendor charges corresponding to Inchcape's provision of portable toilets for this port call, but it does reflect that Inchcape recorded as profit the difference between its billing to the Navy and its payment to its vendor.

88. Inchcape's false invoice overcharged the U.S. Navy by $7,800.00 for portable toilets, which was more than 50% greater than the amount the Contract permitted Inchcape to charge.

89. Inchcape's use of false quantities to increase its revenue on port calls under the Contracts was knowing and widespread, and included the following additional examples:

a. For a port call by the USS Harry S. Truman at Jebel Ali in Dubai in February 2008, Inchcape billed the Navy under CLIN X146 for the rental of 24 portable lighting towers for six days, for a total charge of $28,000.00. The corresponding vendor invoices reflect that the 24 lighting towers were only hired for four days, resulting in an overcharge to the Navy of $9,600.00.

b. For the same port call by the USS Harry S. Truman, Inchcape billed the Navy for five 4-commode units for six days, for a total charge of $11,700.00. The corresponding vendor invoices reflect that three 4-commode units were hired for four days, resulting in an overcharge to the Navy of $7,020.00.

c.      For a port call by the USS Ronald Reagan at Jebel Ali in Dubai in August 2009, Inchcape billed the Navy under CLIN X109AB for the hire of 30 linehandlers on August 10, 2009 and again on August 13, 2009, for a total of $3,261.00.  The corresponding vendor invoices reflect that 20 linehandlers were hired on each day, resulting in an overcharge to the Navy of $1,087.00.

d.      For the same port call by the USS Ronald Reagan, Inchcape billed the Navy under CLIN X146 for the rental of 30 portable lighting towers for four days, for a total charge of $24,000.00.  The corresponding vendor invoices reflect that 24 lighting towers were hired for three days, resulting in an overcharge to the Navy of $9,600.00.

90.      Inchcape's knowing use of false quantities was particularly rampant in billing the Navy for disposal services.

91.      Under the Contracts, Inchcape agreed to provide certain disposal services, including the disposal of grey water and oily waste, and Collection Holding Transfer ("CHT") removal -- i.e., the disposal of human waste and chemical liquids from a ship's onboard toilets. Inchcape used local vendors to provide this service.  The vendor's activity in connection with this service typically was documented in its invoice, as well as the detailed and contemporaneously-recorded trip receipts (reflecting the volume of waste pumped off of the ship and often the amount of time the vendor's trucks were on standby), both of which the vendor routinely provided to Inchcape. Inchcape's billings to the Navy frequently were inconsistent with its vendor's invoices and trip receipts, however.  Indeed, often the quantities Inchcape charged to the Navy were greater than both the quantities reflected on its vendor's invoice and the vendor's contemporaneous trip receipts.  For example:

a.      On the USS Nimitz's port call to Jebel Ali in Dubai under the SWA Contract in late-May and early-June 2007, the amounts Inchcape billed the Navy for CHT removal are inconsistent with vendor records reflecting trips taken by the CHT removal trucks (the "trip tickets") and the vendor's invoice (which also improperly marked-up the standby time incurred by its trucks).  The trip tickets reflect that the vendor removed 802,538 gallons of CHT or 3,037.96 cubic meters (using the conversion rate of US gallons to cubic meters specified in the SWA Contract) and a maximum of 174.5 hours of wait time.  The vendor's invoice reflected 3,038 cubic meters of CHT removed, which was consistent with the vendor's trip tickets, but the vendor's invoice marked up the wait time of its trucks to 368 hours, charging Inchcape $6,624.00 for that wait time.  Inchcape then marked-up the wait time further in its invoice to the Navy charging the Navy 378 hours of wait time -- 10 hours more than the vendor invoice and 203.5 hours more than the trip tickets.  If Inchcape had correctly used the amounts reflected in the trip tickets, which Inchcape had in its file for this call, Inchcape would have charged the Navy $4,884.00 less.

b.      For a port call by the USS Boxer at Mina Sulman in Bahrain in November 2006, Inchcape – operating under the SWA Contract -- billed the Navy $41,522.00 for the removal of 1,597 cubic meters of CHT under CLIN 204AB, "CHT Removal by Barge."  The corresponding vendor invoice reflects that only 954 cubic meters of CHT were removed, resulting in a quantity overcharge of $16,718.00.

92.      Additionally, Inchcape's vendors falsified trip sheets to overstate the volume of waste removed from a ship.  Indeed, Navy auditors observed this practice on one occasion.  In Spring 2014, Naval Audit Services ("NAS") personnel traveled to the port Mina Sulman in the Kingdom of Bahrain to observe a Navy port visit serviced by Inchcape under the SWA Contract.

NAS personnel observed a 4,000 gallon truck operated by Inchcape's CHT vendor pull shipside to pump off CHT collected by two other 4,000 gallon trucks. The first truck ceased pumping off CHT when it was approximately three quarters full.

93.     Despite pumping off only approximately 3,000 gallons of CHT, Inchcape's vendor presented trip receipts to U.S. Navy ship personnel indicating that 8,000 gallons (the total capacity of the two collection trucks) had been removed. Unaware of the vendor's deception, the U.S. Navy ship personnel signed the receipts that falsely indicated the removal of 8,000 gallons of CHT.

94.     High-level Inchcape employees, including Khan and Hyldager, knew about Inchcape's manipulation of CHT volumes. During the December 2007 workshop in Dubai, Khan stated that "playing with the volumes [of CHT] is how you make your money," and advised the attending regional managers and employees to inflate the number of cubic meters of CHT removed. An Inchcape operations representative in Bahrain also stated to Young that Inchcape falsely reported the volume of CHT removed to increase profits. In addition, an assistant port manager in Bahrain confirmed that Inchcape regularly inflated volumetric measurements of CHT and explained in detail how they did it. One method he described was that Inchcape would move the CHT-pumping vehicles away from the ship in order to create the impression that the waste tank was full when, in fact, it was not.

95.     During the tour of Inchcape's Bahrain operations that followed the workshop, another Inchcape representative told Ford, Young, and other Inchcape employees that in Bahrain Inchcape added an hourly charge to its invoices for vehicle standby, on top of the fixed CLIN price for CHT removal. This was not permitted under the SWA Contract and the CLINs applicable to Bahrain.

96.     When Cosgriff expressed his concern about Inchcape's inflation of CHT volumes, Hyldager attempted to justify the practice, contending that the vendor who removed the CHT for Inchcape often understated the volume of CHT it had disposed of in its invoices to Inchcape.

**C.     Inchcape Separately Billed the Navy for Services that Were Expressly Included in CLIN Item Descriptions.**

97.     Inchcape also improperly inflated its invoices under the Contracts by separately billing for services and goods incidental to the provision of CLIN Items.

98.     As noted above, the Contracts plainly and clearly stated that all incidental items necessary for providing CLIN Items were part of the CLIN rate and not to be separately billed unless otherwise stated for the particular CLIN.

99.     Despite these clear directives, Inchcape regularly unbundled its services and billed items incidental to providing CLIN Items.

100.    One such occasion was during a port call by the USS Princeton at Mina Sulman in Bahrain in November 2010.   During that visit, Inchcape provided the Navy CHT disposal services as a CLIN Item under the SWA Contract -- CLIN X204AB, "CHT Removal; Pierside by Barge."

101.    The SWA Contract plainly stated that as part of this CLIN, "[t]he contractor must provide all equipment and facilities required to remove the CHT including hoses and connection compatible with the ships being serviced," and stated more generally that the Contract's CLIN rates "reflect total compensation for the services detailed therein and are fully inclusive of all costs."

102.    Nonetheless, Inchcape separately billed for fenders it used in connection with CHT removal, the mobilization and demobilization of those fenders, and standby charges for its

CHT removal barge.  In total, Inchcape improperly billed the Navy $11,506 for these items, which plainly were incidental to the removal of CHT by barge.

103.    Inchcape frequently employed this tactic of charging separately for services that already were included in the rates for CLIN Items.  For example:

a.      For a port call by the USS Ronald Reagan at Jebel Ali in Dubai in August 2009, Inchcape billed the Navy $27,745.74 for CLINs 104AA and 104AB, "CHT Removal Pierside by Truck" and "CHT Standby Time," respectively, under the SWA Contract.  As stated above, the SWA Contract provided that CLIN prices included "all operating expenses including . . . trucks." Nonetheless, Inchcape separately billed $52,054.68 in "road tanker trip charges" for the transportation of CHT by tanker truck to the disposal site, despite the fact that these transportation costs were incidental to the provision of CHT removal services.

b.      For a port call by the USS Newport News at Mina Sulman in Bahrain in November 2007, Inchcape billed the Navy $1,972 for CLIN X204AA, "CHT Removal Pierside by Truck," under the SWA Contract.  As stated above, the SWA Contract provided that "unless otherwise noted," CLIN prices include "stand-by charges."  The SWA Contract did not provide for the separate billing of CHT stand-by charges for port calls in Bahrain. Nonetheless, Inchcape separately billed the Navy $14,880 in CHT tanker stand-by charges.

c.      For a port call by the USS Tarawa at Mina Sulman in Bahrain in December 2005, Inchcape billed the Navy $45,900.00 for CLIN X204AB, "CHT Removal Pierside by Barge," under the SWA Contract.  In addition, Inchcape separately and improperly billed the Navy $4,400.00 for fenders and stand-by tug charges for the CHT barge.

**D.      Inchcape Charged the Navy Improper Markups on Non-CLIN Items.**

104.    Inchcape also knowingly submitted falsely inflated claims to the Navy by charging improper markups on Non-CLIN Items despite the clear provisions of the Contracts

that obligated Inchcape to arrange for the supply of those items at no additional cost beyond its husbanding fees.

105.    Before 2011, Inchcape knowingly and routinely charged these improper mark-ups without informing the applicable ship's Supply Officer that it was doing so.

106.    For example, the USS Ronald Reagan made a port call at Jebel Ali in Dubai in August 2009, utilizing Inchcape's services under the SWA Contract.   As part of that visit, Inchcape billed the Navy $13,610.00 on Invoice No. DX ANPI 61261 in Non-CLIN items and services for a five day rental of two metal detectors, two x-ray machines, and related technician and mobilization charges.

107.    Inchcape's invoice to the U.S. Navy for these machines and services was false. The vendor invoice corresponding to Inchcape's provision of metal detectors and x-ray machines for this port call reflects the vendor provided two metal detectors for three days for $696.99; two x-ray machines for three days for $5,056.44; and technicians for two days for $273.97, for a total cost of $6,027.40.   The vendor did not include any additional charges for mobilization of the equipment. Accordingly, Inchcape's false invoice overcharged the U.S. Navy by $7,582.60.00 -- *i.e.*, a mark-up exceeding 100% more than the vendor's invoice.

108.    Inchcape's tactic of improperly marking up Non-CLIN Items without notice to the Navy was rampant under the Contracts and included the following other examples:

a.      Inchcape billed the Navy $12,000.00 in Non-CLIN charges for fuel for tugs under the SWA Contract for a port call by the USS Ronald Reagan at Jebel Ali in Dubai in August 2009.   The corresponding vendor invoice reflects that the total cost of the fuel and other "consumables" was $1,200.75.   Thus, Inchcape overcharged the Navy by $10,799.25, *i.e.*, a markup of 900% over the vendor's invoice.

b.      Inchcape billed the Navy $7,240 in Non-CLIN charges under the SWA Contract for 181 cubic meters of oily waste removal by barge for a port call by the USS Boxer at Mina Sulman in Bahrain in November 2006.  The corresponding vendor invoice reflects that 91 cubic meters of oily waste was removed for a total cost of $702.52.  Inchcape overcharged the Navy by $6,537.48, *i.e.*, a markup of almost 1000% over the vendor's invoice.

c.      Inchcape billed the Navy $21,570.64 in Non-CLIN charges under the AFRICOM Contract for the rental of a crane for a port call by the USS Theodore Roosevelt at Cape Town, South Africa in October 2008.  For this same call, Inchcape also billed the Navy $14,739.00 in Non-CLIN charges for the rental of portable toilets.  The corresponding vendor invoice for the cranes reflects that Inchcape marked up the crane charges by over 55%, resulting in an overcharge of $7,750.64.  The corresponding vendor invoices for the toilets reflect that Inchcape marked up the toilet charges by over 20%, resulting in an overcharge of at least $2,742.75.

d.      In June 2008, Inchcape provided port call services under the Peru Contract to the USS Boxer during a port call at Callao and Huacho, Peru.  The Navy directed Inchcape to obtain fuel supplies from a company with whom the Navy had a direct contract for the provision of fuel to Navy ships.  Instead, Inchcape purchased fuel from another vendor, purportedly because it was unable to make arrangements with the Navy contractor in a timely manner.  Inchcape then marked up its invoice to the Navy for this Non-CLIN fuel purchase by $51,328.00.

e.      In March 2009, on the USS Chief's port call to Cozumel, Mexico Inchcape provided a variety of Non-CLIN services, billing the Navy $1,841.29.  In actuality, Inchcape only incurred $1,217.69 in costs for those services and recorded a "Net Profit" of $623.60, reflecting an improper mark-up of more than 50% on Non-CLIN Items.  This fact was expressly noted in Inchcape's port call spreadsheet for this port call.

f.      In May 2009, on the USS Warrior's port call to Panama, Inchcape provided two oil spill booms as Non-CLIN Items.  Inchcape charged the Navy $3,758.40 for these booms when its vendor, Petroamerica Termininal, S.A., charged it only $450.00.  Inchcape thus improperly overcharged the Navy $3,308.40, which it recorded as "Gross Margin" in its accounting system.

109.    By September 2010, Inchcape was aware of the Navy's and the Department of Justice's civil investigation of this matter, and that the investigation included the improper mark-up of Non-CLIN items.

110.    Instead of ceasing its improper practice, Inchcape adopted a new Standard Operating Procedure ("SOP") for the SWA Contract in 2011 that was designed to facilitate its continued mark-up of Non-CLIN Items.  Inchcape did not inform the United States, including any Navy official, of this SOP when it was adopted.

111.    The undisclosed SOP instructed Inchcape employees to present Navy Supply Officers who had requested Non-CLIN Items with a "proposal" that identified one or more potential local vendors and contained two options: either (i) have Inchcape arrange for Non-CLIN Items and pay a markup or (ii) deal directly with potential local vendors with minimal or no assistance from Inchcape.

112.    Occasionally, Inchcape also identified itself as one of the potential vendors.

113.    For each transaction using Inchcape's secret SOP, the proposal stated that "[i]f the Ordering Official requires ISS to purchase and provide the items or services requested, and deliver where necessary, then the ISS mark-up will be charged.  If the Ordering Official will purchase directly from the supplier, then the Ordering Official orders at its own risk, and no mark-up will apply."  Inchcape's "proposals" thus misrepresented to U.S. Navy shipboard

personnel that, in order for Inchcape to provide the procurement facilitation services required by the contract (for which Inchcape already was being paid its husbanding fee), the ship was required to pay an additional fee.

114.     Inchcape did not submit the SOP to the SWA Contracting Officer or otherwise disclose it to the United States when it was adopted, even though (i) the SWA Contract required Inchcape to obtain the Contracting Officer's approval of the SOP, and (ii) Inchcape knew that it was the position of the Navy that the SWA Contract did not permit Inchcape to mark-up Non-CLIN Items.

115.     Instead, Inchcape hid its improper new internal policy from the relevant Government decision-making personnel in the United States while quietly putting it into practice at ports in Southwest Asia.  It was only later, in connection with litigation initiated by Inchcape after it was suspended from federal contracting by the Navy, that Inchcape disclosed the SOP.

116.     The following are examples of Inchcape's practice under the improper 2011 SOP:

a.     For a port call by the USS John C. Stennis at Jebel Ali in Dubai in February 2013, Inchcape billed the Navy under the SWA Contract for numerous markups on Non-CLIN items and services including: (1) a $1,707.35 markup for tugs and barges for a painting job; (2) a $854.62 markup for x-ray machines and metal detectors; and (3) a $295.89 markup for scaffolding.

b.     For a port call by the USS Ponce at Jebel Ali in Dubai in March 2013, Inchcape billed the Navy under the SWA Contract for numerous markups on Non-CLIN items and services including: (1) a $12,284.91 markup for generator hire and related fuel charges; and (2) a $552.46 markup for chair repair.

117.    Even after adopting the SOP, Inchcape continued to bill the Navy for undisclosed markups on Non-CLIN Items.

118.    For example, for a port call by the USS George W. Bush at Jebel Ali in Dubai in October 2011, Inchcape billed the Navy under the SWA Contract for the Non-CLIN rental of beach guard and medical cabins at a daily rate of $280 for six days for a total charge of $3,360.00.  The corresponding vendor invoice reflects that the two cabins were provided for five days at daily respective rates of $54.79 and $53.27 per cabin, resulting in a total cost of $540.34. Inchcape overcharged the Navy by $2,819.66, *i.e.*, a markup of over 500% over the vendor's invoice, which markup was absent from any proposal made under the SOP.

119.    Other examples of undisclosed markups on Non-CLIN items during the October 2011 USS George W. Bush call include: (i) a $9,711.04 markup for tugs; (ii) a $6,643.50 markup on fuel for tugs; and (iii) a $387.54 markup on a reefer container rental.

### E.    Inchcape Mischaracterized Items to Avoid CLIN Rates and Falsely Billed Those Items as Non-CLIN With Substantial Impermissible Markups.

120.    Inchcape further perpetrated its false billing scheme by billing items at marked-up Non-CLIN rates when the items were plainly covered by the Contracts' CLINs.  That is, Inchcape purposely avoided using the appropriate, lower priced CLINs by mislabeling or mischaracterizing services as Non-CLIN to a ship's Supply Officer.

121.    For example, during the May-June 2007 port call by the USS Nimitz at Jebel Ali, Inchcape knowingly misidentified a man lift and charged the Navy a rate in excess of the applicable contract rate.  During the port call, Inchcape purported to provide the Navy with a 140ft man lift (often called a "JLG," the name of the largest manufacturer of manlifts) for a period of seven days.

122.    The SWA Contract contained CLINs for several JLGs, the largest of which was 120 feet in length, to be provided at a daily rate of $540.00.  Inchcape billed the Navy for a 140 feet JLG as a Non-CLIN Item at a daily rate of $850.00, and also charged the Navy for mobilization and demobilization of the JLG, resulting in a total bill of $6,450.

123.    According to the invoice of the vendor that supplied the JLG, however, Inchcape rented and provided the Navy a 120ft JLG, not a 140ft JLG.

124.    Moreover, because the JLG was a CLIN Item, mobilization and demobilization charges incident to providing the JLG were not permitted under the terms of the SWA Contract. Indeed, in addition to the SWA Contract's general language prohibiting charges incidental to the performance of CLINs, the JLG CLIN specifically stated "[r]ental shall be on a daily rate and will include all transportation and positioning charges."

125.    Also, Inchcape charged the Navy for two days' use of the JLG that it did not actually provide -- the vendor invoice reflects only a five-day rental, but Inchcape billed the Navy for seven days' usage.

126.    As a result of Inchcape's improper avoidance of the CLIN covering this service, its improper billing for mobilization and demobilization of the JLG, and its having billed for two more days' service than it actually provided, Inchcape falsely overcharged the Navy by $3,750 for this service alone.

127.    Inchcape's practice of billing for services covered by CLIN Items at a rate higher than permitted by the CLIN was knowing and widespread and included the following additional examples:

a.    The SWA Contract provides that portable electric generators of at least five kilowatt hours are CLIN services to be billed at $110.00 per day.  For a port call by the USS

Ronald Reagan at Jebel Ali in Dubai in August 2009, Inchcape billed the Navy for a five-day hire of portable generators for a beach guard cabin, a bus cabin and computers at a rate of $400.00 per day for each generator, resulting in a total bill of $6,000.00.  The corresponding vendor invoices reflect that Inchcape rented the three generators for only three days at a daily rate of $102.74.  Inchcape's improper avoidance of the CLIN covering this service, and its falsification of the number of rental days resulted in an overcharge to the Navy of $5,010.00.

b. For a port call by the USS Ronald Reagan at Jebel Ali in Dubai in August 2009, Inchcape improperly billed the rental of four JLGs at a rate of $850.00 per day, plus mobilization and demobilization charges, for a total of $13,450.00.  The corresponding vendor invoices reflect that the four JLGs that Inchcape rented were each 120 feet or less and should have been billed at the applicable CLIN rate of $540.00 per day.  Inchcape's charging in excess of the CLIN rate for a 120 foot JLG, and its improper inclusion of mobilization charges, resulted in an overcharge to the Navy of $6,430.00.

F. **Inchcape Failed to Conduct Required Reconciliations and Retained Millions of Dollars in Overcharges Due to the Navy.**

128. Inchcape also retained large amounts of overpayments it received due to differences between estimated billings and the actual amounts the Navy owed Inchcape.

129. As noted above, the SWA Contract required Inchcape to reconcile any estimated billings with actual figures and remit any overcharges no later than 30 days after the end of a port call.

130. Inchcape knowingly engaged in a pattern of failing to remit required reconciliations to the Navy, and it improperly retained millions of dollars as a result.

131. For example, on the May 2007 USS Nimitz port call to Jebel Ali, Inchcape's internal records revealed it had overcharged the Navy by more than $16,000 largely due to

differences between estimates and actuals of port dues and potable water. Although this overcharge was clear in Inchcape's port call accounting system (DREAM), Inchcape did not remit this amount within 30 days to the Navy as required by the SWA Contract. Instead, Inchcape waited nearly 18 months, until late-2008, before taking any efforts to refund these sums to the Navy.

132.    An internal audit by Inchcape in March 2008 reflects the scope of Inchcape's failure to make required reconciliation payments and knowledge of the issue by senior Inchcape management.

133.    Following the December 2007 workshop (*see supra* ¶ 75), Cosgriff expressed to Hyldager his concerns about the substantial evidence that Inchcape was overcharging the Navy on the SWA Contract, and he urged Hyldager to engage Inchcape's outside counsel, Arnold & Porter, LLC, located in Washington, DC, to conduct a full investigation and recommend appropriate action. Instead, Cosgriff and Inchcape Group Secretary Simon Tory directed an Inchcape employee, Bharat Khadalia, to audit the SWA Contract.

134.    The resulting audit report, which Khadalia sent to Hyldager and Tory on March 5, 2008, failed to address many of the concerns expressed by Cosgriff. It did, however, find that Inchcape had retained more than $5 million in Navy overpayments due to differences between estimated and actual quantities billed by Inchcape from August 2005 to January 2008.

135.    The report explained that Inchcape had failed to reimburse the Navy for overcharges on more than 71% of the calls occurring during that period. In addition, the March 2008 Audit report found that during 2007 alone, Inchcape's Dubai and Bahrain offices received $437,000 in "volume discounts/rebates" on Navy business that were not passed on to the Navy as required under the contract.

136.   The audit also determined that Inchcape had spent about $234,000 on entertainment and promotional expenses that could constitute improper monetary arrangements with Navy officials.   These expenditures included lunches, dinners, cameras, cellular phones, t-shirts, desk diaries, and other items bought by Inchcape for Navy officials.

137.   Inchcape did not notify the Navy Contracting Officer responsible for the SWA Contract about the findings in the March 2008 Audit report.   To the contrary, Inchcape management took steps to try to ensure that the report would not be disclosed to the Navy.

138.   Although Inchcape knew as a result of the audit report that it was obligated to remit to the Navy the $437,000 in vendor discounts and rebates its 2008 Audit Report found it had received, Inchcape failed to do so.   Indeed, following the report, Cosgriff informed Hyldager directly that Inchcape must disclose the discounts it received and pass them on to the Navy. Hyldager refused.

139.   From 2008 through 2011, Inchcape quietly sent a small number of reconciliation checks to Navy vessels without any explanation of what they represented.   Many of the checks were not cashed, either because they did not reach their destination or because of the confusion engendered by Inchcape's guileful approach.

140.   Inchcape did not undertake meaningful efforts to return any of the reconciliation money until 2012, *after* the United States petitioned this Court to compel Inchcape to disclose the March 2008 Audit Report.   *United States v. ISS Marine Services, Inc.*, 905 F. Supp. 2d 121, 127-32 (D.D.C. 2012) (Howell, J.).

141.   Additionally, Inchcape's failure to reconcile estimated with actual billings and remit overpayments was not limited to port calls under the SWA Contract.

142.    For example, in March 2009, Ford asked an Inchcape accounts coordinator to reconcile estimated bills with actual bills for port services rendered under the West CONUS Contract to the USS Bonhomme Richard and the USS Pinckney during San Francisco's "Fleet Week" event in 2008.  Burrows determined that Inchcape had overbilled the Navy for the USS Bonhomme Richard and the USS Pinckney port calls by $14,376 and $6,495.41 respectively.

143.    In emails dated March 23, 2009, Ford provided the reconciliation to Inchcape management and offered to deliver refund checks to the ships' personnel.  An Inchcape manager informed Ford that the company did not intend to refund the overpayments.

### G.    Inchcape Generated Vendor Invoices Using a Sham Entity Name to Bill the Navy for Services on the West CONUS Contract.

144.    Inchcape billed the Navy on the West CONUS Contract for services purportedly performed by, and supplies purportedly provided by, a vendor named Harbour Couriers.

145.    On the West CONUS Contract, unlike on other Contracts, Inchcape sometimes submitted vendor invoices to the Navy when submitting its own bills.

146.    For example, on a port call incident to a July 2005 joint logistics over the shore ("JLOTS") exercise under taken by the Navy in and around Port Townsend and Indian Island, Washington, Inchcape presented a Harbour Couriers' vendor invoice to the Navy to document the supposed procurement of cell phones and corresponding delivery charges.  In addition, on a port call by the USS Navajo at the port of San Francisco in January 2005, Inchcape presented a Harbour Courier invoice to the Navy to document the supposed provision of labor to stack pierside police barricades.

147.    Harbor Couriers did not and does not exist.  In reality, "Harbor Couriers" was a trade name used by Inchcape to disguise the fact that it was providing certain services to the Navy on its own account.  This fact was not evident from the Harbor Couriers invoices, which

contained a false business address and phone number distinct from Inchcape's, and Inchcape did not otherwise inform the Navy that it was, in fact, Harbor Couriers.

148.    Moreover, Inchcape took steps to track internally its fraud in this regard by including on its internal "telltale" port summary forms a specific line item to track for Harbour Couriers billings.

149.    Thus, all claims for payment Inchcape submitted to the Navy for supplies or services purportedly provided by Harbor Couriers were false.

**H.      Inchcape Failed to Retain Records to Substantiate Its Billings As Required by Its Contracts.**

150.    Inchcape has also thwarted a comprehensive review of its billings because it has failed to retain certain vendor invoices and other supporting documents identifying the quantities of services provided.

151.    That is, despite the clear obligations of the Contracts, Inchcape has not retained records to substantiate all of its billings and the vendor records it has retained it often claims are inaccurate or incomplete.

152.    For example, the USS Theodore Roosevelt made a port call at Jebel Ali in Dubai in November 2008 utilizing Inchcape's services under the SWA Contract.

153.    As part of that visit, Inchcape billed the Navy for 2660 metric tons of potable water under CLIN 106AA totaling $5,825.40; nine hours of firefighting equipment at a Non-CLIN rate totaling $1,980.00; and two water booster pumps at a Non-CLIN rate totaling $1,700.00 .

154.    Inchcape's port call file neither contains vendor invoices nor any other support for these charges or the quantities billed.

155.    Inchcape's failure to maintain records to support or substantiate its billings was rampant and includes the following other examples.

a.      Inchcape billed the Navy under the SWA Contract for nine hours of firefighting equipment totaling $1,980.00 for a port call by the USS Ronald Reagan at Jebel Ali in Dubai in August 2009.  Inchcape's port call file neither contains vendor invoices nor any other support for these charges or the quantities billed.

b.      Inchcape billed the Navy under the SWA Contract for 1674 metric tons of potable water by barge under CLIN 206AB totaling $20,587.50 for a port call by the USS Boxer at Mina Sulman in Bahrain in November 2006.  Inchcape's port call file neither contains vendor invoices nor any other support for these charges or the quantities billed.

c.      Inchcape billed the Navy under the SWA Contract for 102 hours of port security services totaling $838.44 for a port call by the USS San Juan at Jebel Ali in Dubai in July 2007.  Inchcape's port call file neither contains vendor invoices nor any other support for these charges or the quantities billed.

156.    In addition to the above failures, Inchcape wholly failed to collect or maintain disposal certificates for CHT disposal as required by the SWA Contract.

## III.    INCHCAPE PROFITED RICHLY FROM ITS WRONGFUL CONDUCT AT THE EXPENSE OF THE UNITED STATES.

157.    Through the various aspects of Inchcape's fraudulent scheme, Inchcape obtained overcharges that at times exceeded 30% of a port call's total billed cost.

158.    Inchcape billed hundreds of millions of dollars to the U.S. Navy under the Contracts.

159.    Accordingly, through its false claims and fraudulent scheme, Inchcape reaped tens of millions of dollars of Government funds to which it was not entitled.

**COUNT I -- FALSE CLAIMS ACT -- FALSE CLAIMS**
**31 U.S.C. § 3729(a)(1)(1986)/31 U.S.C. § 3729(a)(1)(A)(2009)**
(By The United States Against All Inchcape Defendants)

160.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 159 above as if fully set forth herein.

161.    As described in detail above, Inchcape made, or caused to be made, claims to the United States for payments under its Contracts that (i) misstated quantities of the goods or services provided; (ii) misstated prices by including mark-ups on Port Tariff Items; (iii) misstated prices by including mark-ups on Non-CLIN Items; (iv) improperly included separate billings for services and supplies incidental to providing CLIN Items; (v) falsely billed CLIN Items as Non-CLIN Items; and (vi) improperly included services performed by sham entities or entities with which Inchcape had a financial interest without prior approvals.

162.    Each of these claims was false or fraudulent.

163.    The falsities in each of these claims were material to the United States' decision to pay as they directly inflated the charges to the United States and led the Government to make payments that, absent the falsity, it would not have made.

164.    Inchcape, through Hyldager, Khan, and other Inchcape executives and employees, had actual knowledge that these claims were false or acted with deliberate ignorance or reckless disregard as to their falsity.

165.    As a result of Inchcape's false claims, which were submitted under the respective Contracts from 2003 to 2014, the United States was damaged in an amount to be determined at trial.

166.    The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

## COUNT II -- FALSE CLAIMS ACT -- FALSE STATEMENTS & RECORDS
### 31 U.S.C. § 3729(a)(1)(B) (2009)
(By the United States Against All Inchcape Defendants)

167.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 166 above as if fully set forth herein.

168.    As described in detail above, Inchcape made, or caused to be made, false statements, or presented false records to, the United States both within its invoices and otherwise in connection with its false claims for payments made under its Contracts.   These false statements and records included (i) misstating the quantities of the goods or services provided; (ii) including mark-ups on Port Tariff Items; (iii) mark-ups on Non-CLIN Items; (iv) improper billings for services and supplies incidental to providing CLIN Items; (v) falsely identifying CLIN Items as Non-CLIN Items; and (vi) improperly including services performed by sham entities or entities with whom Inchcape had a financial interest without prior approvals.

169.    Inchcape's false statements and records were material to its false claims as they had a natural tendency to influence and were capable of influencing the Government to make payments that, absent the falsity, it may not have made.

170.    Inchcape, through Hyldager, Khan, and other Inchcape executives and employees, had actual knowledge that these statements and records were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts described above.

171.    As a result of Inchcape's false statements and records, which were material to false claims submitted under the respective Contracts from 2003 to 2014, the United States was damaged in an amount to be determined at trial.

172.    The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

**COUNT III -- FALSE CLAIMS ACT – REVERSE FALSE CLAIMS**
**31 U.S.C. § 3729(A)(7) (1986) / 31 U.S.C. § 3729(A)(1)(G) (2009)**
(By the United States Against All Inchcape Defendants)

173.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 172 above as if fully set forth herein.

174.    Inchcape received overpayments under its SWA Contract due to differences between estimated quantities it billed the Navy and actual quantities it recorded in its records as having been provided (which records the United States also contends are false, as they misstated the actual services rendered).

175.    The SWA Contracted obligated Inchcape to return these overpayments within 30 days of each port call.

176.    Inchcape knowingly concealed and improperly avoided remitting these overpayments and continued to use, or caused to be used, statements and records (including statements in its invoices to the Navy) that falsely omitted any mention of the overpayments.

177.    Inchcape, through Hyldager, Khan, and other Inchcape executives, acted knowingly in concealing and improperly avoiding its obligations to pay these overcharges, including through the use of false statements and records, as evidenced, in part, by the facts described above.

178.    As a result of Inchcape's concealment and improper avoidance, including through the use of false statements and records, which occurred from 2003 to 2013, the United States was damaged in an amount to be determined at trial.

179.    The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

## COUNT IV – COMMON LAW – BREACH OF CONTRACT -- SWA CONTRACT
### (By the United States Against ISS Dubai and ISS Holdings)

180.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 179 above as if fully set forth herein.

181.    The SWA Contract was a valid written agreement entered into between the United States and ISS Dubai, under the direction and control of ISS Holdings.

182.    Subsequent to its execution, the SWA Contract was modified, amended, or novated to make the contracting parties the United States and ISS Holdings.

183.    Under the SWA Contract, ISS Dubai and later ISS Holdings agreed to provide ship husbanding services and (i) bill the United States accurate quantities and appropriate amounts for those services under the terms of the contract; (ii) conduct reconciliations between estimated and actual quantities and promptly remit any overpayments; (iii) not use vendors with whom Inchcape had a financial interest absent notice and consent of the relevant Contracting Officer; and (iv) retain records to substantiate its billings under the contract.

184.    ISS Dubai, under the direction and control of ISS Holdings, and later ISS Holdings materially breached the SWA Contract by failing to abide by these contract obligations.

185.    ISS Dubai and ISS Holdings' breaches of these contract provisions caused the Government to pay funds to these entities to which they were not entitled.

186.    Based on these breaches of the SWA Contract the United States was damaged in an amount to be determined at trial.

187.    ISS Holdings is also liable for ISS Dubai's contract breaches because ISS Holdings and the Inchcape family of entities controlled and directed the operations of ISS Dubai and (i) used ISS Dubai to perpetrate a fraud on the United States; (ii) used ISS Dubai as a mere agent or instrumentality; and/or (iii) received the fruits of ISS Dubai's breaches and unlawful

conduct leaving ISS Dubai inadequately capitalized to pay its obligations due to the United States.

## COUNT V – COMMON LAW – BREACH OF CONTRACT -- AFRICOM CONTRACT
(By the United States Against ISS Dubai)

188.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 187 above as if fully set forth herein.

189.     The AFRICOM Contract was a valid written agreement entered into between the United States and ISS Dubai.

190.     Under the AFRICOM Contract, ISS Dubai agreed to provide ship husbanding services and (i) bill the United States accurate quantities and appropriate amounts for those services under the terms of the contract; and (ii) retain records to substantiate its billings under the contract.

191.     ISS Dubai materially breached the AFRICOM Contract by failing to abide by these contract obligations.

192.     ISS Dubai's breaches of these contract provisions caused the Government to pay funds to these entities to which they were not entitled.

193.     Based on these breaches of the AFRICOM Contract the United States was damaged in an amount to be determined at trial.

## COUNT VI – COMMON LAW – BREACH OF CONTRACT -- MEXICO CONTRACT
(By the United States Against ISS Panama)

194.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 193 above as if fully set forth herein.

195.     The Mexico Contract was a valid written agreement entered into between the United States and ISS Panama.

196.    Under the Mexico Contract, ISS Panama agreed to provide ship husbanding services and (i) bill the United States accurate quantities and appropriate amounts for those services under the terms of the contract; (ii) not use vendors with whom Inchcape had a financial interest absent notice and consent of the relevant Contracting Officer; and (iii) retain records to substantiate its billings under the contract.

197.    ISS Panama materially breached the Mexico Contract by failing to abide by these contract obligations.

198.    ISS Panama's breaches of these contract provisions caused the Government to pay funds to these entities to which they were not entitled.

199.    Based on these contract breaches of the Mexico Contract the United States was damaged in an amount to be determined at trial.

**COUNT VII – COMMON LAW – BREACH OF CONTRACT --
WEST CONUS CONTRACT**
(By the United States Against ISS Marine)

200.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 199 above as if fully set forth herein.

201.    The West CONUS Contract was a valid written agreement entered into between the United States and ISS Marine.

202.    Under the West CONUS Contract, ISS Marine agreed to provide ship husbanding services and (i) bill the United States accurate quantities and appropriate amounts for those services under the terms of the contract; (ii) not use vendors with whom Inchcape had a financial interest absent notice and consent of the relevant Contracting Officer; and (iii) retain records to substantiate its billings under the contract.

203.    ISS Marine materially breached the West CONUS Contract by failing to abide by these contract obligations.

204.    ISS Marine's breaches of these contract provisions caused the Government to pay funds to these entities to which they were not entitled.

205.    Based on these contract breaches of the West CONUS Contract the United States was damaged in an amount to be determined at trial.

## COUNT VIII – COMMON LAW – BREACH OF CONTRACT -- PANAMA CONTRACT
(By the United States Against ISS Panama)

206.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 205 above as if fully set forth herein.

207.    The Panama Contract was a valid written agreement entered into between the United States and ISS Panama.

208.    Under the Panama Contract, ISS Panama agreed to provide ship husbanding services and (i) bill the United States accurate quantities and appropriate amounts for those services under the terms of the contract; (ii) not use vendors with whom Inchcape had a financial interest absent notice and consent of the relevant Contracting Officer; and (iii) retain records to substantiate its billings under the contract.

209.    ISS Panama materially breached the Panama Contract by failing to abide by these contract obligations.

210.    ISS Panama's breaches of these contract provisions caused the Government to pay funds to these entities to which they were not entitled.

211.    Based on these contract breaches of the Panama Contract the United States was damaged in an amount to be determined at trial.

## COUNT IX – COMMON LAW – BREACH OF CONTRACT -- PERU CONTRACT
(By the United States Against ISS Panama)

212.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 211 above as if fully set forth herein.

213.    The Peru Contract was a valid written agreement entered into between the United States and ISS Panama.

214.    Under the Peru Contract, ISS Panama agreed to provide ship husbanding services and (i) bill the United States accurate quantities and appropriate amounts for those services under the terms of the contract; (ii) not use vendors with whom Inchcape had a financial interest absent notice and consent of the relevant Contracting Officer; and (iii) retain records to substantiate its billings under the contract.

215.    ISS Panama materially breached the Peru Contract by failing to abide by these contract obligations.

216.    ISS Panama's breaches of these contract provisions caused the Government to pay funds to these entities to which they were not entitled.

217.    Based on these contract breaches of the Peru Contract the United States was damaged in an amount to be determined at trial.

**COUNT IX -- COMMON LAW -- FRAUD**
(By the United States Against All Inchcape Defendants)

218.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 217 above as if fully set forth herein.

219.    As described in detail above, Inchcape undertook a wide-scale fraudulent scheme and committed fraud on the United States by making numerous representations that were false including statements in claims made to the United States for payments under its Contracts that (i) misstated quantities of the goods or services provided; (ii) misstated prices by including mark-ups on Port Tariff Items; (iii) misstated prices by including mark-ups on Non-CLIN Items; (iv) improperly included separate billings for services and supplies incidental to providing CLIN Items; (v) falsely billed CLIN Items as Non-CLIN Items; and (vi) improperly included services

performed by sham entities or entities with whom Inchcape had a financial interest without prior approvals.

220.    Each of these representations was false for the reasons stated above.

221.    Inchcape made each of these representations knowing their falsity and with a purposeful and malicious intent to perpetrate a fraudulent scheme on the United States.

222.    Inchcape's misrepresentations were direct and proximate causes of the United States' injuries, as they led the United States to make payments that it would not have made otherwise.

223.    The United States relied on Inchcape's misrepresentations in paying Inchcape's claims for payment.

224.    As a result of Inchcape's fraud, which was perpetrated under the respective Contracts from 2003 to 2014, the United States was damaged in an amount to be determined at trial.

## COUNT X – COMMON LAW – UNJUST ENRICHMENT
(By the United States Against All Inchcape Defendants)

225.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 229 above as if fully set forth herein.

226.    This is a claim for the recovery of monies by which Inchcape has been unjustly enriched.

227.    By directly or indirectly obtaining Government funds to which it was not entitled, each Inchcape Defendant was unjustly enriched and is liable to account and pay such amounts, or the proceeds or profits therefrom, to the United States in an amount to be determined at trial.

## COUNT XI – COMMON LAW – PAYMENT BY MISTAKE
(By the United States Against All Inchcape Defendants)

228.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 232 above as if fully set forth herein.

229.    Inchcape caused the United States to make payments for Inchcape's products and services based upon the United States' mistaken beliefs that Inchcape was charging the Navy appropriate prices and accurate quantities.

230.    As a result of those mistaken payments, the United States has sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that this Court enter judgment in its favor and award the following relief against the defendants named in the respective Counts:

A.    As to Counts I, II, and III, treble the damages sustained by the United States pursuant to the False Claims Act, in an amount to be determined at trial, plus civil penalties pursuant to the False Claims Act for each false claim and false statement made by Inchcape not to exceed $11,000 per false claim or false statement, and post-judgment interest and costs;

B.    As to Counts IV through VIII, for breach of contract, the damages sustained by the United States, in an amount to be determined at trial;

C.    As to Count IX, common law fraud, the damages sustained by the United States, in an amount to be determined at trial;

D.    As to Count X, unjust enrichment, the amount, to be determined at trial, by which the defendants named therein have been unjustly enriched;

E.      As to Count IX, payment by mistake, the amount, to be determined at trial, that the United States paid the defendants named therein as the result of mistake;

F.      As to Counts IV through VIII, as permitted by law, pre-judgment and post-judgment interest, costs, and other recoverable expenses; and

G.      Such other relief as may be just and appropriate.


**The United States Demands A Trial By Jury On All Claims So Triable**


\*    \*    \*

Respectfully submitted,

*As to all allegations and claims set forth above*

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

CHANNING D. PHILLIPS, D.C. Bar #415793
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division, U.S. Attorney's Office

BRIAN P. HUDAK
Assistant United States Attorney


By:_____*/s/ Robert E. Chandler*___
MICHAEL D. GRANSTON
MICHAL TINGLE, D.C. Bar #421587
ROBERT E. CHANDLER
Attorneys, Commercial Litigation Branch
Civil Division, Department of Justice
P.O. Box 261 Ben Franklin Station
Washington, D.C. 20044
(202) 514-4678

*Attorneys for the United States of America*

Dated: February 5, 2016

**<u>Relators' Non-Adopted Claim and Prayer for Relief</u>**

Relators, for themselves, request that this Court award them reasonable attorneys' fees and costs permitted by law.


VOGEL, SLADE & GOLDSTEIN, LLP

By: */s/____Janet L. Goldstein_____*
     JANET L. GOLDSTEIN, D.C. Bar #444861
     1718 Connecticut Ave., NW, 7th Floor
     Washington, DC 20009
     (202) 537-5900
     jgoldstein@vsg-law.com


KATZ, MARSHALL & BANKS LLP

By: */s/____Alison Asarnow_____*
     DEBRA S. KATZ, D.C. Bar #411861
     ALISON ASARNOW, D.C. Bar #984312
     1718 Connecticut Ave., NW, 6th Floor
     Washington, DC 20009
     (202) 299-1140
     katz@kmblegal.com
     asarnow@kmblegal.com

*Attorneys for Relators*